# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 6, 2013 Session

## MARY C. SMITH v. UHS OF LAKESIDE, INC. ET AL.

**Appeal by Permission from the Court of Appeals, Western Section**
**Circuit Court for Shelby County**
**No. CT-004669-05      Kay S. Robilio, Judge**

**No. W2011-02405-SC-R11-CV - Filed July 15, 2014**

This appeal involves the manner in which a trial court granted motions for summary judgment in a proceeding involving the death of a patient whose treatment for viral encephalitis was delayed because he was also being assessed for involuntary commitment to a psychiatric hospital. The widow of the deceased patient filed suit against three health care providers in the Circuit Court for Shelby County. In her original complaint and four subsequent amended complaints, the widow asserted eight causes of action against one or more of the providers. The trial court eventually granted a series of summary judgments dismissing all the claims against one of the providers without explaining the grounds for its decisions and requested counsel for the provider to prepare appropriate orders "establish[ing] the rationale for the [c]ourt's ruling in quite specific detail." The provider's counsel prepared detailed orders adopting all the arguments the provider had made in favor of its summary judgment motions, and the trial court signed these orders over the widow's objections. The widow appealed, arguing that the trial court had failed to provide reasons for its decisions and that the orders did not accurately reflect what had occurred at the summary judgment hearings. The Court of Appeals vacated the disputed orders because the trial court had failed to state the legal grounds for its decisions as required by Tenn. R. Civ. P. 56.04 and remanded the case to the trial court. *Smith v. UHS of Lakeside, Inc.*, No. W2011-02405-COA-R3-CV, 2013 WL 210250, at *12-13 (Tenn. Ct. App. Jan. 18, 2013). We granted the provider's application for permission to appeal. We have determined that the record establishes that the contested orders were not the product of the trial court's independent judgment, and therefore, we hold that the trial court failed to comply with Tenn. R. Civ. P. 56.04.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Affirmed as Modified**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Ashley D. Cleek and Marty R. Phillips, Jackson, Tennessee, for the appellant, UHS of Lakeside, Inc.

Mimi Phillips, Memphis, Tennessee, for the appellee, Mary C. Smith.

**OPINION**

**I.**[1]

James B. Smith worked at the Federal Express facility in Memphis driving a piece of warehouse equipment known as a "tug." He reported for work on Sunday, September 5, 2004, but in the middle of his shift, some co-workers found him asleep in the tug's driver's seat. Mr. Smith appeared lethargic and began crying when he was awakened. After being asked whether he wanted to go home, Mr. Smith responded that he did. Mr. Smith left work at approximately 1:00 p.m. but never made it home that day.

Approximately two hours after Mr. Smith left work, deputies employed by the Shelby County Sheriff found him asleep in his automobile parked on a dead end gravel road two miles from the FedEx facility. When the deputies awakened him, Mr. Smith made nonsensical statements, including that he was nineteen years old[2] and that he was seeing worms coming out of the ground. After satisfying themselves that Mr. Smith was not intoxicated, the deputies took him into custody[3] and transported him to the Lakeside Triage Center ("Triage Center") to evaluate whether he should be involuntarily committed for psychiatric treatment.[4] The deputies informed the Triage Center staff that they had found Mr. Smith asleep in his automobile and that they believed he was "possibly delusional."

---

[1]This case was resolved in the trial court upon summary judgment in favor of UHS of Lakeside, Inc. ("Lakeside"). Accordingly, our recitation of facts should not be read as definitive factual statements. Although some facts do not appear to be in dispute, others are taken in the light most favorable to Ms. Smith as the non-moving party.

[2]Mr. Smith was 63 years old at the time.

[3]*See* Tenn. Code Ann. § 33-6-402 (2007) (authorizing an officer to take an individual into custody for the purpose of obtaining an immediate examination for certification of need for emergency involuntary diagnosis and treatment).

[4]*See* Tenn. Code Ann. § 33-6-404 (2007) (amended 2009) (describing the process for obtaining a certificate of need for emergency involuntary diagnosis and treatment).

The Triage Center was operated by Lakeside but was physically located within the Memphis Regional Medical Center ("The Med"). The operator of The Med, Shelby County Health Care Corporation ("Shelby County Health Care"), had contracted with Lakeside to provide screening for persons believed to be in need of involuntary commitment or other psychiatric services in order to direct them to an appropriate facility. The contract required Shelby County Health Care to "contract with independent contractor physicians to provide 'medical clearances'" for persons arriving at the Triage Center. A "medical clearance" is an examination to determine whether a person has physical medical issues that require immediate medical attention.

Persons arriving at the Triage Center were not expected to remain there for more than six to eight hours. The facility consisted of a small intake room, several small interview or isolation rooms, and a common room with chairs for the patients. It was staffed by a registered nurse and two social workers or assessors,[5] with a physician on call. A physician would ordinarily stop by the Triage Center, typically once in the morning and once in the evening, to perform medical clearances.

Mr. Smith arrived at the Triage Center at 5:25 p.m. on Sunday, September 5, 2004 – the day before Labor Day – and was transported by ambulance to St. Francis Hospital on September 7, 2004, at 6:30 p.m. This lawsuit centers on the treatment Mr. Smith received during his 49-hour stay at the Triage Center.

When Mr. Smith arrived at the Triage Center, he was mentally confused and had a temperature of 100º Fahrenheit. Dr. John O'Connell[6] examined Mr. Smith and later in the evening cleared him medically, which paved the way for an evaluation of whether Mr. Smith should be involuntarily committed. Dr. O'Connell was unable to obtain a good medical history from Mr. Smith because of Mr. Smith's confusion.

Between 2:30 and 3:00 a.m. on September 6, 2004, Cindy Zahn, an assessor employed by Lakeside, conducted a psychological assessment of Mr. Smith. She found him to be confused or nonsensical throughout the assessment, as he was unable to respond effectively to her questions. It was at this point that the Triage Center staff contacted Mr. Smith's wife who had been searching for him since September 5, 2004. Ms. Smith stated that Mr. Smith

---

[5]An assessor typically had experience and training in the mental health field but was not authorized to complete a certificate of need.

[6]Dr. O'Connell's employment status is disputed, particularly if he performed his duties in relation to Shelby County Health Care, Lakeside, or both.

did not have a history of psychiatric problems or substance abuse and that he had been complaining about not feeling well for several days.

Ms. Zahn passed this information on to Avalon Nathaniel, Lakeside's on-duty nurse. Even though her preliminary assessment was that Mr. Smith had a mood disorder, Ms. Zahn suggested to Ms. Nathaniel that Mr. Smith's condition could be caused by something other than a psychiatric disorder. At this point, the evaluation of Mr. Smith proceeded on two parallel tracks – first, an evaluation for involuntary commitment because Dr. O'Connell had issued a medical clearance earlier on the evening of September 5, 2004, and second, further medical tests.

At approximately 3:50 a.m. on September 6, 2004, Dr. O'Connell ordered a urinalysis, blood work, and a CT scan of Mr. Smith's head. At 6:10 a.m., Mr. Smith's temperature had increased to 101°. Mr. Smith's family arrived at the Triage Center at 8:00 a.m. They insisted that Mr. Smith did not have a psychiatric disorder and requested either that he be released in their care or that he be transferred to another hospital for medical tests. Melissa Mills, a nurse employed by Lakeside, informed Mr. Smith's family that he could not be released at that time because he was still being evaluated for involuntary commitment. At 9:43 a.m., the Triage Center received the results of Mr. Smith's tests showing an elevated white blood cell count as well as elevated blood nitrogen ("BUN") and creatinine levels.

At 2:20 p.m. on September 6, 2004, in anticipation of involuntary commitment, Ms. Mills arranged for Mr. Smith to be transferred to Lakeside Hospital, a psychiatric hospital also operated by Lakeside. Later, at 5:00 p.m., Veronica Jackson, a licensed clinical social worker, signed a certificate of need to involuntarily commit Mr. Smith to Lakeside Hospital. By this point, Mr. Smith was drooling, unable to swallow, and so unsteady on his feet that he appeared to be intoxicated.

At 7:10 p.m., Dr. O'Connell, believing that Mr. Smith had experienced a sudden psychotic break, signed the second certificate of need to involuntarily commit Mr. Smith. However, some time between 9:00 and 11:00 p.m., Dr. O'Connell revoked Mr. Smith's medical clearance because he decided that Mr. Smith's medical problems should be addressed before he was transported to Lakeside Hospital. Dr. O'Connell also ordered additional medical tests because he was now concerned that Mr. Smith's symptoms might be caused by medical problems.

Mr. Smith was still in the Triage Center at 7:00 a.m. the following morning. Ms. Mills became concerned that Mr. Smith was "going to crash," and suggested to Dr. O'Connell that Mr. Smith be transported to an emergency room. Dr. O'Connell agreed and ordered Mr. Smith to be transported to The Med's emergency room. Ms. Mills began

contacting The Med's emergency room at 10:30 a.m. but was repeatedly informed that Mr. Smith would not be accepted because the emergency room was on "diversion status."[7]

Mr. Smith lost control of his bladder at 1:00 p.m. At 3:20 p.m., his blood work showed an even higher white blood cell count and increased BUN and creatinine levels. By 4:15 p.m., Dr. O'Connell became convinced that Mr. Smith's symptoms arose from a disease or pathological condition rather than a psychiatric disorder, but The Med's emergency room continued to decline to accept Mr. Smith because it was on "diversion status."

At 4:30 p.m., Dr. O'Connell ordered Mr. Smith to be transported to Baptist East Hospital, but Baptist East reported that it was backed up and could not accept Mr. Smith. Accordingly, Dr. O'Connell approved transporting Mr. Smith to St. Francis Hospital. Mr. Smith left the Triage Center at 6:30 p.m. by ambulance and arrived at St. Francis Hospital's emergency room at 7:15 p.m. At the time of his arrival, Mr. Smith was largely unresponsive and his temperature was 103°.

The physicians at St. Francis Hospital diagnosed Mr. Smith with viral encephalitis. His temperature eventually rose to 105°, and he experienced cerebral edema, seizures, and strokes. He remained in the intensive care unit for several weeks. By November 17, 2004, he had stabilized enough to be released. However, Mr. Smith never regained full function. He was bedridden, required a feeding tube and diapers, and was unable to communicate effectively.

Mr. Smith began to develop respiratory problems in December 2004, which resulted in several hospitalizations at Methodist South Hospital. Mr. Smith died at Methodist South Hospital on February 1, 2005.

## II.

Ms. Smith filed her initial complaint against Lakeside, Shelby County Health Care, and Methodist Healthcare - Memphis Hospitals ("Methodist Healthcare").[8] She filed her first amended complaint on September 6, 2005, but was required to file a second amended

---

[7]The precise meaning of "diversion status" is not detailed in the record, other than to signify that The Med declined to accept the transfer of Mr. Smith to the emergency room.

[8]The record does not contain a copy of Ms. Smith's initial complaint. However, the record reflects that Ms. Smith may have originally filed one lawsuit against Shelby County Health Care and Lakeside and a separate lawsuit against Methodist Healthcare, as the record contains a separate complaint against Methodist Healthcare filed January 20, 2006. The record further reflects that these lawsuits were consolidated at some point.

complaint on December 9, 2005, because she had misnamed a corporate defendant in the first amended complaint. These complaints alleged five causes of action: (1) a health care liability claim, (2) an intentional infliction of emotional distress claim, (3) a negligent infliction of emotional distress claim, (4) a claim for violating the Emergency Medical Treatment and Active Labor Act ("EMTALA") for failing to appropriately screen Mr. Smith when he arrived at the Triage Center, and (5) a claim for violating EMTALA for failing to appropriately transfer Mr. Smith to St. Francis Hospital.

On November 21, 2006, approximately one year after Ms. Smith filed her second amended complaint, Lakeside filed its first motion for summary judgment and statement of undisputed facts. In its motion, Lakeside asserted that Ms. Smith's health care liability claim should fail because Methodist Healthcare's negligence was the independent, intervening cause of Mr. Smith's death. It also challenged both EMTALA claims, as well as the intentional infliction of emotional distress and negligent infliction of emotional distress claims. Ms. Smith filed responses to Lakeside's motion, and Lakeside filed replies to these responses.

The trial court conducted hearings on April 26 and May 16, 2007, apparently focusing on the EMTALA claims, and then took the motion under advisement. In a letter dated August 20, 2007, the trial court informed the parties of its decision to deny Lakeside's motion "at this time" because discovery was not complete and because the trial court desired additional evidence regarding whether the Triage Center was separate from Lakeside Hospital and the effect of The Med's "diversionary" status on the EMTALA claims. On November 9, 2007, the trial court entered an order prepared by Ms. Smith's counsel denying Lakeside's motion for summary judgment "without prejudice to the ability of one or both of these [d]efendants to renew[] their [m]otions, based on additional evidence developed in discovery."[9]

Ms. Smith filed her third amended complaint on June 12, 2009, naming Lakeside and Shelby County Health Care as defendants. This complaint reiterated the previous allegations and causes of actions. However, it added a new claim against Lakeside for false imprisonment, as well as a new claim for battery against Shelby County Health Care.

---

[9]The copy of the November 9, 2007 order contains handwritten deletions, although the source or significance of these deletions is unknown.

On February 12, 2010, Lakeside filed two new motions for summary judgment and renewed its three prior motions for summary judgment.[10] These motions directly challenged Ms. Smith's health care liability, intentional infliction of emotional distress, negligent infliction of emotional distress, EMTALA, and false imprisonment claims. Ms. Smith vigorously contested each of these motions. Both parties filed lengthy briefs articulating their respective positions.

Against this backdrop of the parties' multiple, complex filings, and with the trial scheduled to begin on April 12, 2010, the trial court conducted a lengthy hearing on Lakeside's motions for summary judgment on March 17, 2010. The trial court announced its decision as soon as the parties completed their presentations. The court stated:

> Okay. I'm going to rule in favor of the plaintiff on the EMTALA issue; the false imprisonment, I'm going to rule in favor of Defendant; outrageous conduct, I'm going to rule in favor of the plaintiff; negligent infliction of emotional distress is awfully close, awfully close, but I'm going to rule in favor of the plaintiff; agency is the one that's left and I'm going to rule in favor of the defendant on the question of agency, realizing that it might make folks unhappy.
>
> Some of these issues are awfully close, highly contested and you all want to think about how you want to proceed.

The trial court then observed that "the appellate court is going to want a rationale from our rulings." Accordingly, the trial court stated, "As far as a basis for the ruling, I'm going to let you [Lakeside's counsel] make those. . . . And in the same way [p]laintiff's counsel can then, you were successful on EMTALA, outrageous conduct and the negligent infliction of emotional distress, the motions in which you were successful, you'll prepare the order and the rationale for the Court's ruling."

Ms. Smith's counsel informed the trial court that she intended to seek an interlocutory appeal from the trial court's decision. At this juncture, Methodist Healthcare requested a

---

[10]The parties acknowledge that Ms. Smith settled with Shelby County Health Care. The record suggests that this settlement occurred on July 30, 2009. By the time Lakeside filed its motions for summary judgment on February 12, 2010, the motions identified only Lakeside and Methodist Healthcare as defendants.

severance, and a discussion ensued regarding whether Ms. Smith's case against Methodist Healthcare would be ready to be tried on April 12, 2010.[11]

In light of the trial court's failure to explain the factual and legal basis for its decisions, it comes as no surprise that the parties returned to court on March 25, 2010. Counsel for both parties had prepared orders with regard to the issues that the court had ruled on in their favor. However, the orders prepared by Lakeside's counsel were extremely detailed and, for the most part, included all of the arguments, even alternative arguments, that Lakeside had made in its papers supporting its summary judgment motions. Ms. Smith's counsel insisted that the trial court had not made detailed findings and conclusions during the March 17, 2010 hearing and that Lakeside's draft orders were little more than a regurgitation of the contents of Lakeside's briefs.

Responding to Ms. Smith's arguments, the trial court recalled,

> I wrote [the causes of action] down, and I said which ones
> would fly and which ones wouldn't for each one of you. . . .
> And then on the foundation for the ruling of the Court I ordered
> you all to prepare the Orders. I recall that.

However, the trial court also readily admitted, "But I didn't state the foundation for my ruling." Lakeside's counsel agreed that "the record [of the March 17, 2010 hearing] . . . is not going to reflect the basis for [the trial court's] ruling because you envisioned that we do that through the Orders." Accordingly, the trial court requested Ms. Smith's counsel to prepare detailed objections to the proposed orders.

Counsel for Ms. Smith prepared her specific objections to Lakeside's draft orders,[12] and the parties returned to the trial court on April 8, 2010. The court was not receptive to these objections, even though the court again acknowledged that "I gave you a ruling [on March 17, 2010]. I did not give you . . . anything but the most superficial ruling as to what would go forward and what would not." Accordingly, the trial court signed the draft orders prepared by Lakeside's counsel, stating "I tell you what . . . [counsel for Ms. Smith] is saying she would like to protect the integrity and reputation of the Court, but I'm going to risk it and

---

[11]The trial against Methodist Healthcare was eventually continued when the trial court granted Methodist Healthcare additional time to replace one of its experts.

[12]These objections are not included in the record.

sign [Lakeside's] order and let you all argue the way you want to when you get up [to the appellate court]."[13]

Lakeside filed yet another motion for summary judgment on November 4, 2010, articulating new grounds for the summary dismissal of all of Ms. Smith's remaining claims and relying on the orders the trial court had signed on April 8, 2010. Ms. Smith filed a response on January 4, 2011, vigorously contesting the motion.

The trial court held a hearing on January 5, 2011, focusing primarily on the admissibility of the testimony of one of Ms. Smith's experts. At the conclusion of the parties' arguments, the trial court reserved ruling on Lakeside's motion for summary judgment in order to enable Ms. Smith to obtain a supplemental affidavit from the witness and to give Lakeside an opportunity to depose the witness again.

Apparently, Ms. Smith requested permission to file a fourth amended complaint.[14] On June 10, 2011, the trial court entered an order permitting Ms. Smith to amend her complaint to assert claims of ordinary negligence and negligence per se but denying her request to seek punitive damages. However, the trial court also decided that Ms. Smith "shall not be permitted to include any allegations of 'institutional' or 'corporate' negligence."

Ms. Smith filed her fourth amended complaint on July 22, 2011. This complaint sought damages for personal injuries and wrongful death based on negligence, health care liability, intentional infliction of emotional distress, negligent infliction of emotional distress, false imprisonment, and EMTALA violations. It was substantially similar to the third amended complaint, with the addition of claims for ordinary negligence and negligence per se. As for damages, the fourth amended complaint asserted that Mr. Smith suffered extreme pain and suffering as a result of the health care liability, intentional infliction of emotional distress, negligent infliction of emotional distress, and EMTALA violations, and that this pain and suffering was "in addition to and exacerbated the pain and suffering he would have endured from his viral encephalitis had it been diagnosed and treated within the standard of care." Ms. Smith also alleged that Mr. Smith would have recovered had his condition been properly identified and treated within the standard of care, and it was unlikely he would have suffered profound, irreversible brain damage, months of conscious pain and suffering, and ultimately death.

---

[13]The trial court granted Ms. Smith's motion to pursue an interlocutory appeal, but the appeal was denied by the Court of Appeals and this Court.

[14]The record does not contain Ms. Smith's motion to amend her complaint.

On July 14, 2011, Lakeside filed a supplemental memorandum in support of its renewed motion for summary judgment. Ms. Smith filed a supplemental response on August 3, 2011. The parties returned to court on August 5, 2011. The trial court vacillated regarding its decision during this hearing. Initially, the court stated that it would deny Lakeside's motion; however, shortly thereafter, the trial court stated that it was granting Lakeside's motion with regard to the EMTALA claims. Later, changing course again, the trial court stated that it was going to deny Lakeside's motion. Finally, however, the trial court announced that it needed more time to consider the motion.

The parties were back in court on September 6, 2011. The trial court asked whether Ms. Smith would be entitled to an appeal of right if it granted Lakeside a summary judgment. The court commented that the possibility of a plaintiff prevailing at trial and receiving a recovery "which is then taken away by the [a]ppellate [c]ourts" was "the worst of all possibles."

Toward the end of the hearing, the trial court, addressing Ms. Smith's counsel, said, "I understand you disagree with the [c]ourt's position on this." When Ms. Smith's counsel asked if "the [c]ourt already ruled," the trial court responded,

> I'm ruling now. I think I've heard ample discussion on this. And I'm directing the [d]efendant to prepare the order and to establish the rationale for the [c]ourt's ruling in quite specific detail, and let this go forward as quickly as possible to the [a]ppellate [c]ourt.

Perplexed, Ms. Smith's counsel inquired whether the trial court was ruling in Lakeside's favor on the ordinary negligence and negligence per se claims. The trial court responded that it was granting Lakeside summary judgment on all claims.

The parties returned to court on September 15, 2011, to discuss Ms. Smith's objections to the order prepared by Lakeside's counsel. These objections were similar to Ms. Smith's objections to the April 8, 2010 order that had also been prepared by Lakeside's counsel. Ms. Smith's counsel asserted that "the problem with the [o]rder is that [counsel for Lakeside] has asserted things in the [o]rder that the [c]ourt did not rule. Just things that he wants, wishes the [c]ourt had ruled on, but the [c]ourt was silent on those things." The trial court conceded that "[i]t may be that things are part of . . . opposing counsel's order that may have been a part of my thought processes, although I didn't specifically articulate them." The language of the order, which was filed on October 3, 2011, is essentially drawn from the text of the papers Lakeside had filed in support of its motion for summary judgment.

Ms. Smith appealed the orders granting Lakeside's motions for summary judgment. On January 18, 2013, the Court of Appeals vacated the orders granting summary judgment and remanded the case to the trial court for the entry of orders that complied with Tenn. R. Civ. P. 56.04. *Smith v. UHS of Lakeside, Inc.*, 2013 WL 210250, at *1. The appellate court concluded that "the trial court's oral statements provide absolutely no basis for the trial court's ruling." *Smith v. UHS of Lakeside, Inc.*, 2013 WL 210250, at *10. It also decided that "[b]y requiring counsel for Lakeside to establish the rationale for the decision, the trial court abrogated its duty pursuant to Rule 56.04." *Smith v. UHS of Lakeside, Inc.*, 2013 WL 210250, at *10. The Court of Appeals observed that "[t]his practice is in clear violation of the letter and the spirit of Rule 56.04." *Smith v. UHS of Lakeside, Inc.*, 2013 WL 210250, at *11.

### III.

This appeal requires us to address the relationship between three important procedural principles. The first principle, reflected in Tenn. R. Civ. P. 56.04, is that "[t]he trial court shall state the legal grounds upon which the court denies or grants the motion [for summary judgment], which shall be included in the order reflecting the court's ruling." The second principle is that, after the trial court has decided a summary judgment motion, it is permissible for the trial court to authorize counsel to prepare and to submit a proposed order for the court's consideration.[15] The third principle is that courts speak through their orders, judgments, and minute entries.[16]

The trial court did not state the legal grounds for its decisions to grant Lakeside's motions for summary judgment when it announced its rulings from the bench on March 17, 2010, and on September 6, 2011. However, the orders filed by the trial court on April 8, 2010, and October 3, 2011, contain detailed statements of the factual and legal grounds upon which the order was based. The question we must answer is whether these grounds were Lakeside's or the trial court's. Lakeside insists that grounds stated in the orders prepared by its counsel must be attributed to the trial court because these orders constitute the court's last official word on the matter. Ms. Smith insists that Tenn. R. Civ. P. 56.04 requires trial courts to state their grounds for granting or denying a summary judgment before a draft order is submitted to the court. We have determined that Ms. Smith has the better argument. We have also determined that this record does not demonstrate that the detailed grounds in the

---

[15]*Cf. Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51, 53 (Tenn. 1981).

[16]*Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013); *see also State v. Woodall*, 729 S.W.2d 91, 93 (Tenn. 1987).

April 8, 2010 and October 3, 2011 orders were the product of the trial court's own independent judgment.

## A.

The courts in Tennessee that comprise the Judicial Branch of state government are the sole constitutional repositories of judicial power. Tenn. Const. art. VI, § 1; *Mengel Box Co. v. Fowlkes*, 135 Tenn. 202, 206, 186 S.W. 91, 92 (1916); *Jones' Heirs v. Perry*, 18 Tenn. (10 Yer.) 59, 69 (1836). They are the places where justice is judicially administered. *In re Cumberland Power Co.*, 147 Tenn. 504, 508, 249 S.W. 818, 819 (1922). Because these courts have the power to fully and finally adjudicate cases and controversies, *Jackson v. Smith*, 387 S.W.3d 486, 494 (Tenn. 2012), their effective functioning is indispensable to democracy, *Anderson Cnty. Quarterly Court v. Judges of the Twenty-Eighth Judicial Circuit*, 579 S.W.2d 875, 881 (Tenn. Ct. App. 1978).

The essential purposes of courts and judges are to afford litigants a public forum to air their disputes, *Childress v. Bennett*, 816 S.W.2d 314, 315 (Tenn. 1991), and to adjudicate and resolve the disputes between the contending parties, *State ex rel. Stall v. City of Knoxville*, 211 Tenn. 428, 434, 365 S.W.2d 433, 435 (1963). To carry out these purposes, judges must arrive at their decisions by applying the relevant law to the facts of the case. *Summers v. Thompson*, 764 S.W.2d 182, 190 (Tenn. 1988) (Drowota, J., concurring) (quoting *Scott v. Marley*, 124 Tenn. 388, 395, 137 S.W. 492, 493 (1911)). Because making these decisions is a "high judicial function," *see Nashville, Chattanooga & St. Louis Ry. Co. v. Price*, 125 Tenn. 646, 649, 148 S.W. 219, 220 (1911), a court's decisions must be, and must appear to be, the result of the exercise of the trial court's own judgment, *Summers v. Thompson*, 764 S.W.2d at 190 (Drowota, J., concurring) (quoting *Perkins v. Scales*, 2 Tenn. Cas. (Shannon) 235, 237 (1877)). *See also Delevan-Delta Corp. v. Roberts*, 611 S.W.2d at 53 (stating that trial judges should carefully examine findings and conclusions prepared by counsel to "establish that they accurately reflect his [or her] views and conclusions, and not those of counsel").

The manner in which judges arrive at their decisions "gives formal and institutional expression to the influence of reasoned argument in human affairs." Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L. Rev. 353, 366 (1978). In addition to expecting judges to be "fair, impartial, and engaged," Douglas R. Richmond, *Unoriginal Sin: The Problem of Judicial Plagiarism*, 45 Ariz. St. L.J. 1077, 1105 (2013) ("Richmond"), the litigants, the bench and bar, and the public expect them to explain why a particular result is correct based on the applicable legal principles, Chad M. Oldfather, *Writing, Cognition, and the Nature of the Judicial Function*, 96 Geo. L.J. 1283, 1334 (2008).

Providing reasons for a decision reinforces the legitimacy of the legal process which, in turn, promotes respect for the judicial system. John J. Brunetti, *Searching for Methods of Trial Court Fact-Finding and Decision-Making*, 49 Hastings L.J. 1491, 1495 (1998) ("Brunetti"). As Judge Richard Nygaard has noted with regard to judicial opinions:

> Judicial opinions are the core work-product of judges. They are much more than findings of fact and conclusions of law; they constitute the logical and analytical explanations of why a judge arrived at a specific decision. They are tangible proof to the litigants that the judge actively wrestled with their claims and arguments and made a scholarly decision based on his or her own reason and logic.

*Bright v. Westmoreland Cnty.*, 380 F.3d 729, 732 (3d Cir. 2004).

**B.**

Prior to July 1, 2002, Tenn. R. Civ. P. 56.04 was silent with regard to explanations regarding decisions to grant or deny summary judgments. However, following an amendment to the rule that became effective on July 1, 2002, trial courts were required "upon request . . . [to] state the legal grounds upon which the court grants the motion, which shall be included in the order reflecting the trial court's ruling."[17] The rule was amended again effective on July 1, 2007. The amended rule made the statement of grounds mandatory rather than optional and expanded the application of the rule to circumstances in which the trial court denies a motion for summary judgment. Accordingly, Tenn. R. Civ. P. 56.04 currently states that "[t]he trial court shall state the legal grounds upon which the court denies or grants the motion, which shall be included in the order reflecting the court's ruling."

The changes to Tenn. R. Civ. P. 56.04 were intended to address two concerns. First, they reflect the growing awareness of both the Advisory Commission and this Court that explanations of the basis for judicial decisions promote respect for and acceptance of not only the particular decision but also for the legal system. Second, skeletal orders containing no explanation of the reasons for granting the summary judgment were complicating the ability of the appellate courts to review the trial court's decision. *See, e.g., Church v. Perales*, 39 S.W.3d 149, 157 (Tenn. Ct. App. 2000) (noting that skeletal orders lacking a

---

[17]In a comment to this amendment, the Advisory Commission on the Rules of Practice and Procedure distinguished Tenn. R. Civ. P. 56.04 from Tenn. R. Civ. P. 52.01 by noting that the statement of grounds required by Tenn. R. Civ. P. 56.04 need not be as elaborate as findings of fact and conclusions of law required by Tenn. R. Civ. P. 52.01.

statement of grounds required appellate courts to "perform the equivalent of an archeological dig [to] endeavor to reconstruct the probable basis for the [trial] court's decision" (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 8 (1st Cir. 1998)).

Despite the amendments to Tenn. R. Civ. P. 56.04 making the statement of grounds mandatory, the Court of Appeals has been reticent to vacate summary judgment orders that plainly do not comply with Tenn. R. Civ. P. 56.04 and to remand them to the trial court for further consideration. The court continues to conduct archeological digs and to review summary judgment orders when the basis for the trial court's decision can be readily gleaned from the record[18] and to remand the case only when their practiced eyes cannot discern the grounds for the trial court's decision.[19]

We readily agree that judicial economy supports the Court of Appeals' approach to the enforcement of Tenn. R. Civ. P. 56.04 in proper circumstances when the absence of stated grounds in the trial court's order does not significantly hamper the review of the trial court's decision. However, in the future, the resolution of issues relating to a trial court's compliance or lack of compliance with Tenn. R. Civ. P. 56.04 should also take into consideration the fundamental importance of assuring that a trial court's decision either to grant or deny a summary judgment is adequately explained and is the product of the trial court's independent judgment.

## C.

The current acceptance of the practice of trial courts requesting or permitting counsel for prevailing parties to prepare draft findings of fact, conclusions of law, and orders differs significantly from the categorical disapproval of this practice a century ago.[20] In 1981, this Court stated explicitly that "it is permissible and indeed sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions."

---

[18]*See e.g.*, *Burse v. Hicks*, No. W2007-02848-COA-R3-CV, 2008 WL 4414718, at *2 (Tenn. Ct. App. Sept. 30, 2008) (No Tenn. R. App. P. 11 application filed); *White v. Pulaski Elec. Sys.*, No. M2007-01835-COA-R3-CV, 2008 WL 3850525, at *3 (Tenn. Ct. App. Aug. 18, 2008) (No Tenn. R. App. P. 11 application filed); *Burgess v. KONE, Inc.*, No. M2007-02529-COA-R3-CV, 2008 WL 2796409, at *2 (Tenn. Ct. App. July 18, 2008) (No Tenn. R. App. P. 11 application filed).

[19]*See, e.g.*, *Winn v. Welch Farm, LLC*, No. M2009-01595-COA-R3-CV, 2010 WL 2265451, at *4-6 (Tenn. Ct. App. June 4, 2010) (No Tenn. R. App. P. 11 application filed).

[20]In 1911, for example, this Court held that trial courts committed reversible error when they delegated the responsibility to prepare findings of fact to counsel. *Nashville, Chattanooga & St. Louis Ry. Co. v. Price*, 125 Tenn. at 649-50, 148 S.W. at 220.

*Delevan-Delta Corp. v. Roberts*, 611 S.W.2d at 53. Our approval of this practice over thirty years ago was not rhapsodically unequivocal. We noted at that time that "[f]indings prepared by the trial judge which represent his [or her] independent labor are preferable." *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d at 53.

Like many federal courts and other state courts, we continue to adhere to the view that findings of fact, conclusions of law, opinions, and orders prepared by trial judges themselves are preferable to those prepared by counsel. We likewise share the concern expressed by federal courts and other state courts about the practice of courts adopting verbatim findings of fact, conclusions of law, opinions, and orders prepared by counsel for the prevailing party. For example, the United States Supreme Court has criticized federal trial courts for their "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985). Expressing concerns similar to those expressed by this Court over seventy years earlier,[21] the Court noted "the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. at 572.

However, despite its concern regarding a court's verbatim adoption and approval of findings of fact and conclusions of law prepared by counsel for the prevailing party, the Court declined to hold that the trial court's request that counsel for the prevailing party prepare the findings and conclusions was reversible error for two reasons. First, the Court noted that the trial court had filed a memorandum opinion setting forth its decision and its rationale for the decision before requesting counsel to prepare proposed findings of fact and conclusions of law. Second, the Court noted that the trial court reworked the findings and conclusions submitted by counsel and that the findings and conclusions that the trial court ultimately adopted varied considerably in organization and content from those counsel had submitted. Based on these two facts, the Court found that the record readily demonstrated that the trial court's findings and conclusions "represent[ed] the judge's own considered conclusions." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. at 573.

The United States Supreme Court's reliance on the fact that the trial court had considerably altered the findings and conclusions prepared by counsel for the prevailing party underscores a point we made earlier. A trial court's verbatim adoption of verbiage submitted

---

[21]In 1911, this Court prohibited trial courts from ordering counsel to prepare draft findings of fact and conclusions of law, noting that "[c]ounsel have a natural bias with respect to cases in which they are engaged that makes it well-nigh impossible for them to fairly and fully present all the facts as the judge would do." *Nashville, Chattanooga & St. Louis Ry. Co. v. Price*, 125 Tenn. at 649, 148 S.W. at 220.

by the prevailing party detracts from the appearance of a hardworking, independent judge and does little to enhance the reputation of the judiciary.[22]  At the very least, it gives rise to the impression that the trial judge either has not considered the losing party's arguments,[23] or has done little more than choose between two provided options rather than fashioning a considered, independent ruling based on the evidence, the filings, argument of counsel, and applicable legal principles.[24]  At worst, it risks creating an appearance of bias or the impression that the trial court ceded its decision-making responsibility to one of the parties.[25]

In the almost thirty years since *Anderson* was decided, most courts have approved, but not recommended, the practice of trial courts receiving and using party-prepared findings of fact, conclusions of law, and orders as long as two conditions are satisfied.  First, the findings and conclusions must accurately reflect the decision of the trial court.  Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision.  *Aiken Cnty. v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 677 (4th Cir. 1989); *Clady v. County of Los Angeles*, 770 F.2d 1421, 1427 (9th Cir. 1985); *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 809-11 (Tenn. Ct. App. 2009); *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 253-54 (Tenn. Ct. App. 1990).  Accordingly, reviewing courts have declined to accept findings, conclusions, or orders when the record provides no insight into the trial court's decision-making process, *Trieschmann v. Trieschmann*, 504 N.W.2d 433, 435 (Wis. Ct. App. 1993), or when the record "casts doubt" on whether the trial court "conducted its own independent review, or that the opinion is the product of its own judgment," *Bright v. Westmoreland Cnty.*, 380 F.3d at 732.

There are, to be sure, acceptable reasons for permitting trial courts to request the preparation of proposed findings of fact, conclusions of law, and orders.  They can promote the expeditious disposition of cases, and they may, when used properly, assist the trial court in placing the litigants' factual and legal disputes in sharper focus.  In the final analysis, the ultimate concern is the fairness and independence of the trial court's judgment.[26]

---

[22]Brunetti, 49 Hastings L.J. at 1502-03; Richmond, 45 Ariz. St. L.J. at 1079.

[23]Carol M. Bast & Linda D. Samuels, *Plagiarism and Legal Scholarship in the Age of Information Sharing: The Need for Intellectual Honesty*, 57 Cath. U. L. Rev. 777, 801 (2008).

[24]Brunetti, 49 Hastings L.J. at 1502.

[25]Richmond, 45 Ariz. St. L.J. at 1079-80, 1086.

[26]Richmond, 45 Ariz. St. L.J. at 1098.

**D.**

We now turn to the appropriate application of Tenn. R. Civ. P. 56.04 to the circumstances of this case. At the outset, we do not find that Tenn. R. Civ. P. 56.04 is in any way inconsistent with the custom of permitting trial courts to request and consider proposed orders prepared by the prevailing party.[27] However, as we emphasized in the context of the findings of fact and conclusions of law required by Tenn. R. Civ. P. 52.01, Tenn. R. Civ. P. 56.04 must be interpreted in a way that assures that a trial court's decision whether to grant or deny a motion for summary judgment is its own. *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d at 53.

Thus, for the reasons we have already discussed, we conclude that Tenn. R. Civ. P. 56.04 requires the trial court, upon granting or denying a motion for summary judgment, to state the grounds for its decision before it invites or requests the prevailing party to draft a proposed order.[28] Not only will this requirement assure that the decision is the trial court's, it will also (1) assure the parties that the trial court independently considered their arguments, (2) enable the reviewing courts to ascertain the basis for the trial court's decision, and (3) promote independent, logical decision-making. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990); *State v. King*, ___ S.W.3d ___, ___, 2014 WL 1622210, at \*4 (Tenn. 2014).

Using these standards, we first consider the April 8, 2010 orders granting Lakeside a summary judgment dismissing Ms. Smith's false imprisonment claim and those claims based on Lakeside's vicarious liability for the conduct of the physicians at the Triage Center. These extremely detailed orders are essentially a restatement of the arguments contained in Lakeside's filings in support of its motions for summary judgment.

---

[27]Nor do we find it inconsistent with local rules of court that call upon counsel for the prevailing party to submit an order reflecting the trial court's ruling. *See, e.g.*, Tenn. 30th J. Dist. Cir. Ct. R. 10(A) ("Orders or decrees shall be prepared by counsel for the prevailing party and submitted to adversary counsel for approval."). If, however, the local rules were inconsistent with Tenn. R. Civ. P. 56.04, that rule would prevail. *See* Tenn. Sup. Ct. R. 18(c) ("[A]ny local rule that is inconsistent with a statute or a procedural rule promulgated by the Supreme Court shall be invalid.").

[28]A trial court may comply with this requirement in a number of ways. First, the trial court may state the grounds for its decision at the same time it announces its decision on the record. Second, the trial court may announce its decision and inform counsel that it will provide the grounds in a subsequently filed memorandum or memorandum opinion. Third, after announcing its decision, the trial court may notify the parties of the grounds for its decision by letter, as long as the letter has been provided to all parties and has been made part of the record.

-17-

While the trial court made comments and asked questions during the March 17, 2010 hearing, we do not construe any of these comments as an articulation of the grounds upon which the trial court had decided to grant the motions. To the contrary, after the court announced that "I'm going to rule in favor of [Lakeside]" with respect to both false imprisonment and vicarious liability, the court stated that it was leaving the "basis for the ruling" or the "rationale for the [c]ourt's ruling" to counsel for Lakeside.

Lakeside does not dispute this sequence of events. However, it insists that even though the trial court did not articulate any grounds for its decision prior to the preparation of the draft order, the grounds contained in the order drafted by its counsel should be imputed to the trial court because the court eventually signed the order. We decline to accredit this reverse-engineered circumvention of Tenn. R. Civ. P. 56.04. While, as a general matter, courts speak through their orders, *Morgan Keegan & Co. v. Smythe*, 401 S.W.3d at 608; *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001), this principle presupposes the performance of the judicial act reflected in the order. In this case, the judicial act should have consisted not only of announcing a decision to grant part of Lakeside's motions for summary judgment but also stating the grounds for that decision. Because the record demonstrates that the trial court did not provide the basis for its decision prior to the preparation of the draft orders, the grounds stated in the order cannot be attributed to the trial court.

The trial court's October 3, 2011 order granting Lakeside a summary judgment on all of Ms. Smith's remaining claims suffers from the same shortcomings as its April 8, 2010 orders. During the three hearings conducted before the trial court announced its decision from the bench, the trial court openly acknowledged that the motion presented difficulties and that it needed additional time to consider the motion.

At the conclusion of the third hearing held on September 6, 2011, the trial court expressed its desire to avoid what it perceived to be the "worst of all possibles" – a trial resulting in a plaintiff's verdict that is overturned on appeal. Thus, after announcing that it had decided to grant a summary judgment dismissing all the remaining claims against Lakeside, the trial court directed counsel for Lakeside "to prepare the order and to establish the rationale for the [c]ourt's ruling in quite specific detail." This statement can only be construed as the trial court's decision to leave to Lakeside's counsel the task of stating the grounds for its decision.

Considering the context surrounding both the April 8, 2010 and the October 3, 2011 orders, no conclusion can be drawn other than that the trial court failed to comply with Tenn. R. Civ. P. 56.04. The trial court failed to state its grounds when it decided to grant Lakeside's motions for summary judgment, and the record provides no basis for imputing the

reasons included in the orders prepared by Lakeside's counsel to the trial court. In this case, we find that the trial court failed to perform the "high judicial function" required by Tenn. R. Civ. P. 56.04. It did not provide the parties with the grounds for its decision, which would have demonstrated that it had exercised its own independent judgment in reaching the decision ultimately reflected in the summary judgment orders.

## IV.

We affirm the judgment of the Court of Appeals vacating the orders granting Lakeside's motions for summary judgment and remand the case to the trial court for further proceedings consistent with this opinion. Because we have not addressed the merits of Lakeside's motions, Lakeside is free to renew its motions after the case returns to the trial court. We tax the costs of this appeal to UHS of Lakeside, Inc. and its surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE