# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 30, 2014 Session

## VALERIE BRIDGEFORTH v. DALE JONES ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 09C740      Thomas W. Brothers, Judge**

---

**No. M2013-01500-COA-R3-CV - Filed January 26, 2015**

---

This is an action by a prospective member of a start-up limited liability company for breach of contract, unjust enrichment, promissory estoppel, and breach of fiduciary duty and fair dealing against the company and its managing member. Plaintiff claims to have an enforceable agreement to acquire a five percent interest in the limited liability company in consideration for her intangible capital contributions, that being her sweat equity rendered during the formative phase of the company. Defendants deny all claims and insist that Plaintiff knew she would have to contribute $30,000 in cash as her capital contribution in exchange for the agreed upon membership interest in the company. The trial court summarily dismissed all claims upon the conclusion that Plaintiff could not prove a prima facie case for any of her claims as she could not show any contract or enforceable promise existed, that she was compensated as an employee, and that the remaining claims failed as a matter of law. We affirm the dismissal of the claims of promissory estoppel and breach of fiduciary duty; however, we have determined that material facts are disputed concerning the existence of a contract which precludes summary dismissal of the claims for breach of contract and unjust enrichment. Accordingly, the judgment of the trial court is affirmed in part and reversed in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Reversed in Part**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Lorraine Wade, Nashville, Tennessee, for the appellant, Valerie Bridgeforth.

Charles K. Grant and Bradley M. Bakker, Nashville, Tennessee, for the appellees, Dale Jones and Kingdom Creations, LLC, a Tennessee Limited Liability Company.

# OPINION

Valerie Bridgeforth ("Plaintiff") is a stylist who has been a cosmetologist in Nashville, Tennessee, for over 25 years; she has been certified as an educational associate for Paul Mitchell salons for over thirteen years, and she owns her own salon.

On or around August 2005, Plaintiff had the first of several meetings with Dale Jones, Kevin Johnson, and two other individuals for the purpose of creating a new business organization, Kingdom Creations, LLC ("Kingdom Creations" and "the LLC"), that would own and operate a cosmetology school in the Nashville area. As Plaintiff states in her deposition and interrogatories, Dale Jones asked her to be one of the five original members of the new business due to her experience in the industry, her reputation as an educator, and her favorable connections with Paul Mitchell's franchise operations and owners of other cosmetology schools so that she could help facilitate the acquisition of a Paul Mitchell Partner School franchise and an existing cosmetology school that was certified. As she explained it, she was promised a five percent membership interest in the new LLC in consideration for her intangible capital contribution - "sweat equity" - in facilitating the acquisition of a Paul Mitchell school franchise and a certified cosmetology school. According to Plaintiff, although cash capital contributions by the prospective members were discussed, the meetings also focused on what each prospective member could "bring to the table," and what she could bring to the table were her connections within the industry, specifically with Paul Mitchell franchise operations and owners of other cosmetology schools who were willing to sell their school to the LLC.

In support of her argument that she was entitled to acquire a five percent membership interest in the LLC for her intangible contributions, Plaintiff relies on the unsigned draft of the Organization by Written Consent of Kingdom Creations, LLC, specifically section 2.3, which states in pertinent part:

2.3 <u>Contribution Agreements</u>. Contribution Agreements from the following persons, offering to pay *tangible or intangible property in exchange for Membership Interests of the Company*, are hereby deemed adequate and accepted:

| Member | *Consideration* | Governance Interest |
|---|---|---|
| Dale A. Jones | $390,000 | 65% |
| Susan Harris | $120,000 | 20% |
| Kevin Johnson | $60,000 | 10% |
| *Valerie Bridgeforth* | *$30,000* | *5%* |

(Emphasis added).

Mr. Jones disputes much of Plaintiff's testimony; he testified that the organizational meetings from August to December focused on, *inter alia*, cash investments from each prospective owner. According to Mr. Jones, the initial capital of the proposed LLC was determined based upon the estimated cost of establishing the cosmetology school,[1] and once each prospective member determined the percentage of ownership he or she desired or could afford, a corresponding value was assigned for that percentage of ownership, which became the "consideration" each prospective member was to contribute to obtain his or her respective membership interest in the company.

With respect to Plaintiff's specific capital contribution, Mr. Jones admits that Plaintiff was never given anything in writing stating that her capital contribution had to be in cash, or otherwise tangible, to acquire her anticipated membership interest in the LLC; nevertheless, he insists that she and the other prospective members were repeatedly told that their capital contributions had to be in cash. Plaintiff, however, disputes this fact stating that, during a private meeting she had with Mr. Jones and his wife, Mr. Jones stated to Plaintiff, "You do not need to worry about any money, simply because of what you are bringing to the table. If you're worried about the money part, you can rest your mind at ease. You do not have to worry about that." Based upon these statements, Plaintiff contends she began doing the necessary work to make the school a reality, and that one of her first contributions to the company was when she introduced Mr. Jones to Winn Claybaugh, a founder of the Paul Mitchell schools, along with other people instrumental in securing a Paul Mitchell school franchise. By doing so, she states that this availed Mr. Jones and their new company of her connections and personal relationship with the Paul Mitchell franchise.[2]

In December 2005, four months after Plaintiff first met with Mr. Jones and the other three prospective members, the Articles of Organization for Kingdom Creations, LLC, were filed with the Office of the Tennessee Secretary of State. The Articles of Organization stated that there were five members of the LLC at the time of filing, but the identity of the members was not provided; the only person identified in the Articles of Organization was Mr. Johnson, who was identified as the Organizer of Kingdom Creations.

---

[1]Mr. Jones stated this projected number was based upon information from "part of the performer" which provided "some framework of what the total cost would be," their architect, and attorneys.

[2]The group also traveled to Florida where they attended Paul Mitchell functions and gained information about opening a franchise.

Also in December 2005, *unsigned drafts* of the Organization by Written Consent of Kingdom Creations and Contribution Agreements were prepared. As stated earlier, Section 2.3 of the Organization by Written Consent provides that "Contribution Agreements from the following persons, *offering to pay tangible or intangible property in exchange for Membership Interests of the Company*, are hereby deemed adequate and accepted[.]" (Emphasis added). Following this sentence, each prospective member's name was listed, including the name of Plaintiff, along with their respective governance percentage and contribution amount; however, the document did not indicate whether the prospective members were "offering to pay" the amount with tangible or intangible property. The document indicated that Plaintiff would obtain a five-percent governance interest for a contribution amount of $30,000.

Two months later, in February 2006, Mr. Jones, acting on behalf of Kingdom Creations, executed a franchise agreement with Paul Mitchell Advanced Education LLC, in which it was contemplated that Kingdom Creations would soon acquire an existing cosmetology school. As Mr. Jones explained, it was vastly preferable to purchase an accredited cosmetology school as it would be more profitable for the LLC.[3]

Thereafter, as Plaintiff explains it, once Mr. Jones's individual efforts in obtaining an accredited school fell through, he asked her to "bring to the table" an accredited school the LLC could acquire. Plaintiff then informed Mr. Jones of her longtime friends John and Juanda Nave who owned Jon Nave University ("JNU"), an accredited cosmetology school the Naves had operated in Nashville for over forty years. It is undisputed that Mr. Jones wanted Plaintiff to get the Naves to sell their accredited school to her; thus, beginning in February 2006, Plaintiff and Mr. Jones entered into discussions with the Naves about purchasing JNU. Three months later, in May 2006, Kingdom Creations purchased JNU from the Naves for $35,000, which Plaintiff insists was a "special price" given by the Naves because of their personal relationship with Plaintiff, and because they thought Plaintiff was going to be an owner of the school; Mr. Jones disputes this fact stating that the Naves previously offered to sell JNU for the same price to another potential buyer.

Soon after the purchase of JNU, Plaintiff began working as an instructor while the school transitioned to become a Paul Mitchell Partner School franchise. At some point in June or July, Plaintiff consulted with Mr. Jones about her expenses in taking time away from

---

[3]The acquisition of a certified cosmetology school was very significant for a newly created cosmetology school cannot qualify for federal loans or grants for its students until it has national accreditation which typically takes two years. Accordingly, the acquisition of an existing accredited school provided substantially more students with the opportunity to attend school with the assistance of financial aid and, thus, making the school more profitable from its inception.

her salon, while additionally working at the school; they agreed Plaintiff would receive $15 an hour in compensation for her work at the school.

According to Plaintiff, after she "brought to the table" both the Paul Mitchell school franchise and JNU, thereby fulfilling her capital contributions, she states that Mr. Jones told her she needed to contribute $30,000 in cash "as soon as possible" to receive her five percent membership interest in the LLC. Plaintiff did not identify when this conversation may have occurred; however, it likely occurred in July 2006. Although Plaintiff insists she had an agreement with Mr. Jones that she would receive her interest in the LLC in consideration for her facilitating the acquisition of the Paul Mitchell school franchise and JNU, she did not want to lose her five percent membership; therefore, she attempted to secure the funds.

On August 1, 2006, the Operating Agreement of Kingdom Creations, LLC was executed, which identified each member of the LLC, their respective contributions and governance interest. The members included Mr. Jones, Mr. Johnson and three others, but not Plaintiff. Mr. Jones testified that it was in September 2006 when he informed Plaintiff that she could not become a member of the LLC and that her prospective interest had been acquired by someone else. Soon thereafter, Plaintiff severed her relationship with Mr. Jones and the school. Plaintiff further stated that she now believes Mr. Jones never intended to make her an owner of the LLC; instead, he used her for her connections and ability to get an accredited school.

Plaintiff commenced this action in November 2008; Mr. Jones was the only defendant when the action was first commenced.[4] On August 21, 2012, Plaintiff filed an amended complaint ,which identified Mr. Jones and Kingdom Creations as the defendants (collectively "Defendants") and stated claims for (1) breach of contract, (2) quantum meruit, implied contract, and unjust enrichment, (3) promissory estoppel, and (4) breach of fiduciary duty and fair dealing. Defendants answered and discovery ensued, which included written discovery and depositions of Plaintiff and Mr. Jones.

Defendants filed a motion for summary judgment along with a statement of undisputed facts and documents in support thereof, including, *inter alia*, deposition excerpts of Plaintiff and Mr. Jones. A hearing on the motion for summary judgment was held on May

---

[4]Plaintiff filed a Civil Warrant against Mr. Jones in the Metropolitan General Sessions Court for Davidson County, Tennessee, which was issued on November 19, 2008. The lawsuit was transferred from the general sessions to the Circuit Court for Davidson County, Tennessee, in March 2009; the Civil Warrant became the leading process in the current lawsuit. Plaintiff then filed an amended complaint on September 10, 2010, following an agreed order on Mr. Jones' motion for more definite statement.

20, 2013, at which Defendants argued summary judgment was appropriate because Plaintiff could not prove a prima facie case for any of her claims. Plaintiff insisted that material facts were disputed and that she had presented a prima facie case, which precluded summary judgment. At the conclusion of the hearing, the trial judge announced from the bench that he found "no genuine issues of material fact," and that he "adopted and incorporated" all of Defendants' arguments and summarily dismissed all claims. In the order that followed, the court simply stated, "For the reasons stated on the record in open court, the Court finds that Defendants' motion is well-taken and it should be and hereby is GRANTED and all claims against Defendants are DISMISSED, with prejudice."

## STANDARD OF REVIEW

This appeal arises from the grant of summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment de novo with no presumption of correctness. *Martin v. Norfolk Southern Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1977). As does the trial court, the appellate court considers the evidence in the light most favorable to the nonmoving party and resolves all inferences in that party's favor. *Martin*, 271 S.W.3d at 84; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, the appellate court first determines whether factual disputes exist. If a factual dispute exists, the court then determines whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

A properly supported motion for summary judgment must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *see also Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998). If the moving party makes a properly supported motion, then the nonmoving party is required to establish the existence of the essential elements of the claim. *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215. If, however, the moving party does not properly support the motion, then the nonmoving party's burden to produce either supporting affidavits or discovery is relieved and the motion must fail. *McCarley*, 960 S.W.2d at 588; *Martin*, 271 S.W.3d at 83.

To make this showing and shift the burden of production, a moving party may affirmatively negate an essential element of the nonmoving party's claim, or show that the nonmoving party cannot prove an essential element of the claim at trial. *Martin*, 271 S.W.3d at 83; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Byrd*, 847 S.W.2d at 215 n.5. Whichever approach the moving party takes, both require more than assertions of the nonmoving party's lack of evidence. *Martin*, 271 S.W.3d at 83-84. In addition, the moving party must present evidence that more than "raises doubts" about the ability of the nonmoving party to prove its claim at trial. *Id.* at 84. The moving party must produce evidence or refer to previously submitted evidence. *Id.*; *accord Hannan*, 270 S.W.3d at 5. Thus, to negate an essential element of a claim, a moving party must refer to evidence that tends to disprove an essential element of the claim made by the nonmoving party. *Martin*, 271 S.W.3d at 84.

## ANALYSIS

### I. THE TRIAL COURT'S RESPONSIBILITIES UNDER TENN. R. CIV. P. 56.04

In a decision rendered by our Supreme Court after the trial court made its summary judgment ruling in this case, that being *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303 (Tenn. 2014), the Court made clear that Tenn. R. Civ. P. 56.04, which expressly provides that the trial court shall "state the legal grounds upon which the court denies or grants the motion which shall be included in the order reflecting the court's ruling," is *mandatory*. *Id.* at 314. The Court also made clear the requirement that trial judges state the legal grounds upon which a summary judgment ruling is based is not a matter of form over substance. To the contrary, it is to assist the appellate courts to glean from the record the basis for the trial court's decision. *Id.* It is also to assure that the decision is the product of the trial court's independent judgment. *Id.* As the Court explained in *Smith*:

> Despite . . . Tenn. R. Civ. P. 56.04 making the statement of grounds mandatory, the Court of Appeals has been reticent to vacate summary judgment orders that plainly do not comply with Tenn. R. Civ. P. 56.04 and to remand them to the trial court for further consideration. The court continues to conduct archeological digs and to review summary judgment orders when the basis for the trial court's decision can be readily gleaned from the record and to remand the case only when their practiced eyes cannot discern the grounds for the trial courts decision.
>
> We readily agree that judicial economy supports the Court of Appeals' approach to the enforcement of Tenn. R. Civ. P. 56.04 in proper circumstances when the absence of stated grounds in the trial court's order does not

significantly hamper the review of the trial court's decision. However, in the future, *the resolution of issues relating to a trial court's compliance or lack of compliance with Tenn. R. Civ. P. 56.04 should also take into consideration the fundamental importance of assuring that a trial court's decision either to grant or deny a summary judgment is adequately explained and is the product of the trial court's independent judgment.*

*Id*. (emphasis added). The Court went on to explain:

[F]or the reasons we have already discussed, we conclude that Tenn. R. Civ. P. 56.04 requires the trial court, upon granting or denying a motion for summary judgment, to state the grounds for its decision before it invites or requests the prevailing party to draft a proposed order. [footnote in original] Not only will this requirement assure that the decision is the trial court's, it will also (1) assure the parties that the trial court independently considered their arguments, (2) enable the reviewing courts to ascertain the basis for the trial court's decision, and (3) promote independent, logical decision-making.

*Id*. at 316-17 (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990); *State v. King*, 432 S.W.3d 316, 322 (Tenn. 2014)). The footnote in the above quote reads:

A trial court may comply with this requirement in a number of ways. First, the trial court may state the grounds for its decision at the same time it announces its decision on the record. Second, the trial court may announce its decision and inform counsel that it will provide the grounds in a subsequently filed memorandum or memorandum opinion. Third, after announcing its decision, the trial court may notify the parties of the grounds for its decision by letter, as long as the letter has been provided to all parties and has been made part of the record.

*Id*. at 316 n.28.

In addition to the mandate in *Smith*, if the non-moving party timely files a properly supported response in opposition to the motion along with a statement of disputed facts with specific citations to the record as Tenn. R. Civ. P. 56.03 requires to support the assertion that material facts are disputed which preclude summary judgment, the court must determine whether factual disputes exist. *See Byrd*, 847 S.W.2d at 214-15. Further, if the court determines that factual disputes exist, the court must then determine whether the facts are material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Id.* at 215. Admittedly, the trial court's

-8-

responsibilities under Tenn. R. Civ. P. 56.04 can be distinguished from those under Tenn. R. Civ. P. 52.01, regarding actions tried upon the facts without a jury, for "the statement of grounds" required by Tenn. R. Civ. P. 56.04 need not be as elaborate as "findings of fact and conclusions of law" required by Tenn. R. Civ. P. 52.01. *Smith*, 439 S.W.3d at 313 n.17. Nevertheless, this distinction does not relieve the trial court of its responsibilities to determine whether factual disputes exist when the non-moving party so contends, and, if so, whether the facts are material to the claim or defense upon which the summary judgment is predicated, and whether the disputed fact creates a genuine issue for trial. *See Byrd*, 847 S.W.2d at 215.

The trial court's ruling from the bench in the case at bar, which was rendered prior to *Smith*, reads as follows:

> All right, thank you both for good briefs on this. I'm well familiar with this case. I have examined it and I, respectfully, do find there are no genuine issues of material fact and the Defendant is entitled to a judgment as a matter of law. I adopt and incorporate all of the arguments espoused by the Defendant in this particular motion. I am persuaded on each of your arguments. I agree with them.
>
> And I note that flowing through it is a common thread that most of the problems experienced by [Plaintiff] in this matter are premised on her unfortunate inability to procure the necessary funds for participation in this venture. But on all the claims, I find that you're entitled to a judgment as a matter of law and the case be dismissed. Costs will be taxed to the Plaintiff.
>
> Prepare the Order, [counsel for Defendants] . . . .

The final order granting summary judgment was also brief, it reads in pertinent part:

> For the reasons stated on the record in open court, the Court finds that Defendants' motion is well-taken and it should be and hereby is GRANTED and all claims against Defendants are DISMISSED, with prejudice.

Having reviewed the transcript of the hearing, and specifically the trial court's ruling from the bench, we are hesitant to conclude that the trial court's statements, "I adopt and incorporate all of the arguments espoused by the Defendant[s] in this particular motion," "I am persuaded on each of your arguments," and "I agree with them," constitute an adequate explanation of the legal grounds for its decision to grant summary judgment as required by Tenn. R. Civ. P. 56.04. Nevertheless, what is more significant to this appeal is that Plaintiff

timely filed a response in opposition to the motion that was properly supported by a statement of disputed facts with specific citations to the record, as Tenn. R. Civ. P. 56.03 requires, to support her claim that material facts were indeed disputed which precluded summary judgment, yet the trial court made no reference to any fact Plaintiff insisted was both disputed and material. We find this significant for, as noted earlier, when reviewing the evidence at the summary judgment stage, the court must *first* determine whether factual disputes exist, and if a factual dispute exists, the court must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *See Byrd*, 847 S.W.2d at 214-15.

Because Plaintiff filed a response along with a properly supported statement of disputed facts with citations to the record to assert that material facts were in dispute, it was incumbent on the trial court to determine whether the facts identified by Plaintiff were material to the claims or defenses upon which the summary judgment was predicated and, if so, whether any of the disputed facts created a genuine issue for trial. *See id*. The trial court made no findings regarding Plaintiff's assertion that material facts were disputed other than to state from the bench: "I'm well familiar with this case. I have examined it and I, respectfully, do find there are no genuine issues of material fact and the Defendant is entitled to a judgment as a matter of law." We, however, have determined that Plaintiff identified facts that are indeed disputed; therefore, it is incumbent upon us to determine whether these disputed facts are material to any claim or defense upon which the grant of summary judgment was predicated and "whether the disputed fact creates a genuine issue for trial." *Id*. at 214.

## A. Disputed Facts

At the hearing, Defendants represented to the trial court that Mr. Jones did not make the statements Plaintiff relied upon to form, in part, the alleged oral agreement; instead, Defendants represented to the trial court that the wife of Mr. Jones, who is not a party, made the statements, not Mr. Jones. Based on these "facts," Defendants insisted that the promises Plaintiff relied on were made by a non-party (the wife of Mr. Jones) and, therefore, the statements were inadmissible hearsay. However, contrary to Defendants' representations to the trial court, Plaintiff testified that it was the defendant, Mr. Jones, who made the statements she relied upon, which formed, in part, the basis of her understanding that her sweat equity would constitute the requisite capital contribution for her to acquire the agreed upon five percent membership interest. Moreover, during the hearing Plaintiff advised the court of evidence in the record showing that it was Mr. Jones who made the statements, not his wife. In spite of this apparent dispute of fact, the trial court made no finding other than to state "there are no genuine issues of material fact"; therefore, the court's ruling was based, at least in part, on an erroneous understanding of a material fact that is disputed.

-10-

Because the trial court's ruling is silent as to who made these representations to Plaintiff and whether it is inadmissible hearsay, combined with the fact that the court "adopted[ed] and incorporate[ed]" all of Defendants' arguments, it appears the trial court accepted Defendants' erroneous representation that the statements were inadmissible hearsay. As a consequence of this misapprehension of a material fact and its admissibility, the court excluded from consideration evidence upon which Plaintiff relies to establish not only that this material fact is disputed, but, additionally, that she can prove at trial the specific terms of the agreement by which she is entitled to a five percent membership interest in the LLC and that she reasonably relied upon Mr. Jones's promises to her detriment.

Next, Defendants contend the core of this lawsuit is that Plaintiff was required at all times to bring money to the table to obtain a five percent ownership interest in Kingdom Creations, and she was unable to do so; thus, as Defendants suggest, *because* "no material dispute exists on this key issue," Plaintiff's claim for breach of contract fails. At the hearing, Defendants represented that the following facts were "undisputed":

> It started out with six people[5] . . . [a]nd those early discussions were clear in terms of what people could bring to the table as far as *monetary contributions* to this undertaking. At some point the *debt lines were set*. The record is clear. These facts are *not in dispute*.

(Emphasis added). However, the record reveals these facts are disputed by Plaintiff; specifically, the dispute arises as to whether or not Plaintiff's contribution was to be *intangible*, per the claimed oral promises by Mr. Jones, or a *tangible* amount of $30,000, cash, as alleged by Defendants. Plaintiff's response to Defendants' statement of undisputed material facts provides the following:

> 14. In order to receive her membership interest in Kingdom Creations, LLC, Plaintiff was expected to contribute $30,000. (Bridgeforth Dep. at 64:1 - 65:6; 128:11 - 129:16; 134:5-16; 161:20 - 162:19).
>
> > **RESPONSE:** Denied. Valerie Bridgeforth was told that she did not have to contribute capital [Footnote: For purposes of this motion, the word "capital" will have the same meaning as money since the Defendants contend that the only "capital" Ms. Bridgeforth was supposed to have is cash tender.] to be a part of the Paul Mitchell School because of her relationship with Paul

---

[5]Although "six people" were in attendance at the first meeting, including Plaintiff, only five of them were contemplated to become members of the LLC; the sixth person was Mr. Jones' wife.

Mitchell and the Naves. (Valerie Bridgeforth Dep. p. 61 ¶¶15-21, P.66 ¶¶1-21.) The Organization by Written Consent Agreement section 2.3 allowed the members to pay their contribution by tangible or intangible property. Ex. 8. . . .

This fact is again put at issue in Defendants' response to Plaintiff's statement of undisputed material facts, which states:

8) Ms. Bridgeforth was told that she did not have to contribute cash money to be a part of Kingdom Creations because of her relationship with Paul Mitchell and JNU. Valerie Bridgeforth Dep. p. 61 ¶¶15-21, p. 66 ¶¶1-12.

RESPONSE: Disputed. Plaintiff knew she had to contribute money to receive an ownership interest, (Bridgeforth Depo. at 64:1 - 65:15; Dale Jones Depo. at 39:23 - 40:15), but this fact is not material for purposes of summary judgment.

Additionally, Plaintiff responded to the third paragraph of Defendants statement of undisputed facts as follows:

3) Sometime in 2005, Plaintiff, Dale Jones, . . . began discussing the possibility of investing in a school of cosmetology in or around Nashville, Tennessee. (Bridgeforth Dep. at 38:19-39:21).

RESPONSE: Admitted that they began meeting but deny that the meetings were about investing. The meetings were about what would be the things that had to be done to get a Paul Mitchell school. Investing was not the focus. [Plaintiff] Dep. P. 39 ¶¶19-25; p. 40 ¶¶1-10.

Moreover, Mr. Jones' deposition reads as follows:

Q. So between August 2005 until January 2006, did you meet with Valerie again?
[Mr. Jones] Yes. We had several meetings. We went to talk about several things about how we're going to go about it, again, just doing the general leg work about starting a business. It doesn't just start up by itself.

***

Q. So you all would meet and every time you met, the only thing you talked about was how much this was going to cost?

[Mr. Jones] That and also we talked about, you know, what the company is going to look like in terms of the structure of the school.

Q. When you say what its going to look like -- because when you all were meeting, you all did plan on it being a Paul Mitchell school?

[Mr. Jones] Sure.

Both Plaintiff and Defendants submitted deposition testimony of the parties as evidence to support their respective responses to the statement of undisputed facts.[6] Admittedly, certain sections of Plaintiff's deposition testimony cited by Defendants presents confusion as to her contribution; however, summary judgment requires us to review the evidence in a light most favorable to the non-moving party, which in this case is Plaintiff, and allow all reasonable inferences in her favor. *Martin*, 271 S.W.3d at 84. Accordingly, when Plaintiff's deposition is read in context with the testimony cited by Plaintiff to create a dispute of fact as to whether her contribution was to be tangible or intangible in the form of her sweat equity, we find the following statements prevalent:

Q. And what was going to be your financial contribution to that $1.5 million?

[Plaintiff]. My sweat equity, because of my relationships with the people affiliated with the program.

Q. And that was it, your sweat equity?

[Plaintiff]. The sweat equity.

Q. Because of your relationships --

[Plaintiff]. And my affiliation with the Jon Nave School as well, because it was a fully accredited school.

\*\*\*

Q. Okay. But in any event, isn't it true that you were expected to make a monetary contribution?

[Plaintiff]. No.

Q. It was never -- that was never the case?

\*\*\*

Q. It was never the case that you were to make a monetary contribution?

[Plaintiff]. No.

---

[6]The record includes the relevant portions of the depositions of each party, which were provided in support of each party's statement of undisputed facts or response thereto in order to establish that a fact is disputed.

Q. That was never the intention?
[Plaintiff]. No.

Moreover, Plaintiff insists she created a genuine dispute of fact that the parties mutually assented to the contract pursuant to which she would acquire a five percent membership interest in the LLC in consideration for her sweat equity as her intangible capital contribution. She relies on specifically identified portions of her deposition testimony and specifically identified statements of fact to establish, or at least create a dispute of fact, that Mr. Jones told her that her $30,000 contribution to capital would be her efforts - her sweat equity - in assisting the LLC to acquire a Paul Mitchell school franchise and an existing cosmetology school that was accredited. In making this argument, not only does Plaintiff rely on the deposition testimony and statements of disputed and undisputed facts she specified in her response to the motion for summary judgment, she also relies on the unsigned draft of the Organization by Written Consent of Kingdom Creations, LLC, specifically section 2.3. This section states in pertinent part:

> 2.3 <u>Contribution Agreements</u>. Contribution Agreements from the following persons, offering to pay *tangible or intangible property in exchange for Membership Interests of the Company*, are hereby deemed adequate and accepted:

| Member | Consideration | Governance Interest |
| --- | --- | --- |
| Dale A. Jones | $390,000 | 65% |
| Susan Harris | $120,000 | 20% |
| Kevin Johnson | $60,000 | 10% |
| *Valerie Bridgeforth* | *$30,000* | *5%* |

(Emphasis added).

Plaintiff relies upon this document to establish that her contributions to the LLC could be paid through "*tangible* or *intangible property*," thereby directly contradicting Mr. Jones' allegation that all members had to pay *tangible contributions* in the form of cash to receive their membership interest. Plaintiff also relies on the terms of the contribution agreement to establish, or create a dispute of fact, that the parties specifically agreed that she could receive a five percent membership interest in the LLC in consideration for her "intangible" contribution, that being the intangible services she rendered - her "sweat equity" - during the

-14-

start-up of the company, which they agreed would be valued at $30,000. Conversely, Defendants contend that the documents prove Plaintiff, like the other members, was required at all times to financially contribute to obtain her five percent interest.[7]

Having determined that the above facts are indeed disputed, we shall now determine whether they are material to the claims or defenses upon which summary judgment was predicated and, if so, whether any of the disputed facts created a genuine issue for trial for any claim or defense. *See Byrd*, 847 S.W.2d 208, 215 (stating, because summary judgment is intended to avoid unnecessary trials, "the test for a 'genuine issue' is whether a reasonable jury could legitimately resolve that fact in favor of one side or the other. . . . If the answer is yes, summary judgment is inappropriate; if the answer is no, summary judgment is proper because a trial would be pointless as there would be nothing for the jury to do and the judge need only apply the law to resolve the case.").

## II. BREACH OF CONTRACT

A claim for breach of contract requires: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citations omitted).

A contract can be expressed, implied, written, or oral. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991) (quoting *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)). "While oral contracts are enforceable, persons seeking to enforce them must demonstrate (1) that the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable." *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (citing *Davidson v. Holtzman*, 47 S.W.3d 445, 453 (Tenn. Ct. App. 2000); *Castelli v. Lien*, 910 S.W.2d 420, 426-27 (Tenn. Ct. App. 1995). The contemplated mutual assent need not be manifested in writing; it may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions. *Id*. However, the contemplated mutual assent "should not . . . be inferred from the unilateral acts of one party or by an ambiguous course of dealing between the parties from which different inferences regarding the terms of the contract may be drawn" and it "may not rest solely on the uncommunicated intentions or states of mind of the contracting parties." *Id*.

---

[7]Adding to the conflicting testimony of the parties, the deposition testimony of Mr. Jones alleges Plaintiff had an initial deadline to pay $120,000 in January 2006, which is in direct conflict with the $30,000 he alleges she was to pay in December 2005 in accordance with the draft document.

"Indefiniteness as to any essential element of an agreement may prevent the creation of an enforceable contract." *Peoples Bank of Elk Valley*, 832 S.W.2d at 553 (citing *Jamestowne*, 807 S.W.2d at 564. Therefore, a contract must be sufficiently explicit so a court can perceive the respective obligations of the parties. *Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Jamestowne*, 807 S.W.2d at 564 (quoting Restatement (Second) of Contracts § 33(2) (1981)). Moreover, the "[d]estruction of contracts because of uncertainty has never been favored by the law, and with the passage of time, such disfavor has only intensified. *Gurley v. King*, 183 S.W.3d 30, 34 (Tenn. Ct. App. 2005).

"Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed." *Id*. at 41 (quoting Restatement (Second) of Contracts § 34(2) (1979)). "Likewise, even if uncertainty remains, where one party has acted in reliance on an indefinite agreement the courts will act to protect that reliance whether through a contractual or non-contractual remedy." *Id*. at 42; Restatement, *supra* § 34(3).

The foregoing understood, we shall first consider whether Defendants have shown, based on pleadings, depositions, and statements of disputed and undisputed facts, that there is no genuine issue as to any material fact concerning Plaintiff's claim that an enforceable contract existed by which Plaintiff was entitled to acquire a five percent membership interest in the LLC in consideration for her intangible capital contribution, her sweat equity.

## A. Enforceable Contract

Defendants' insist the trial court correctly dismissed Plaintiff's breach of contract claim because no enforceable contract existed for Plaintiff to acquire a membership interest in the LLC; stated another way, they insist the terms of the contract alleged by Plaintiff were not sufficiently explicit to establish an enforceable contract. As Defendants put it, Plaintiff's claim is based on an unenforceable "Agreement to Agree."

Plaintiff acknowledges that the parties never executed a written agreement; however, she contends she identified explicit details of the parties respective contractual obligations for it to be enforceable, and that she acted in reliance on the existence of a contract. Alternatively, Plaintiff insists she created a genuine dispute of fact as to the existence of an enforceable agreement; specifically, that the parties mutually assented to the contract pursuant to which she would acquire a five percent membership interest in the LLC in consideration for her intangible capital contribution, and that she fully performed the obligations for which she is entitled to the agreed upon five percent membership interest. In

making this argument Plaintiff relies, not only on her testimony and that of Mr. Jones, but also the written terms of the unsigned draft of the Organization by Written Consent of Kingdom Creations, LLC, specifically section 2.3.

### i. The Respective Obligations of an Oral Contract Must be Sufficiently Explicit to be Enforceable

It is undisputed that Plaintiff was one of the initial five prospective members of the LLC and that she participated in weekly organizational meetings from August to December 2005. It is also undisputed that Plaintiff was afforded the opportunity to acquire a five percent membership interest in the LLC as evidence by, *inter alia*, the specific provisions set forth in section 2.3 of the Organization by Written Consent of Kingdom Creations, LLC, which reads:

| Member | Consideration | Governance Interest |
| --- | --- | --- |
| Dale A. Jones | $390,000 | 65% |
| Susan Harris | $120,000 | 20% |
| Kevin Johnson | $60,000 | 10% |
| Valerie Bridgeforth | $30,000 | 5%. |

It is, however, disputed whether Dale Jones, who was to acquire the majority interest as noted above, orally promised Plaintiff she did not have to contribute $30,000 cash as her capital contribution and, instead of cash, she would utilize her cosmetology experience, connections with the franchising entity for Paul Mitchell schools, and her relationship with the Naves, the owners of an accredited cosmetology school, on behalf of the LLC. More specifically, Plaintiff testified that Mr. Jones told her "You do not need to worry about any money, simply because of what you are bringing to the table. . . . If you're worried about the money part, you can rest your mind at ease. You do not have to worry about that." This fact is, however, disputed because Mr. Jones denies making such a statement.

The documentary evidence, which Plaintiff contends is sufficiently explicit to identify the respective obligations of the parties as it pertains to the agreement by which she *would* acquire a definite membership interest, that being a five percent membership interest in the LLC, in consideration for her intangible capital contributions, is in section 2.3 of the Organization by Written Consent of Kingdom Creations, LLC. Plaintiff insists this document provides specific terms of the parties' respective obligations. For example, the Contribution Agreements specifically identifies who is to become a member, their respective membership interest, and the "consideration" to be provided in exchange for their respective membership interests for it states in pertinent part that "the following persons," have offered "to pay . . . intangible property in exchange for Membership Interests of the Company," and

-17-

immediately below this section, Plaintiff's name is specifically stated in writing as acquiring a five percent interest in "consideration" of "$30,000."

Plaintiff also relies on the fact that the Contribution Agreement does *not* specify that her $30,000 "consideration" must be in *cash*; to the contrary, the writing specifically states that her contribution may be in the form of "intangible property."[8] She also relies on the fact the document lists four members whose aggregate membership interests total 100%. Thus, the document fully supports her testimony that their agreement was "sufficiently explicit" in that she was entitled to acquire a specific membership interest in the LLC, that being a "5%" membership interest in consideration for her intangible contributions.

Plaintiff additionally testified that she relied on the agreement by rendering the services expected of her, her sweat equity,[9] to facilitate the acquisition of the Paul Mitchell school franchise and an accredited cosmetology school, both of which were accomplished. She also testified that she relied on the agreement by taking time away from her salon, to her detriment, to promote the LLC to facilitate the acquisition of the Paul Mitchell school franchise and the Naves' accredited cosmetology school. Plaintiff further testified that it was not until after she successfully fully performed her part of the agreement that Mr. Jones attempted to change the agreement by demanding, for the first time, a tangible cash contribution of $30,000 for Plaintiff to acquire her five percent interest.

---

[8]The Organization by Written Consent of Kingdom Creations, LLC does not provide the meaning of "intangible property" in the context of the alleged agreement, and we are mindful that the term intangible property can have many varying meanings depending on the intent of the parties or the context of its use. For example: "Intangible property" is defined liberally as "property that lacks a physical existence." *See* Black's Law Dictionary (9th ed. 2009), which provides "stock options and business goodwill" as examples. Courts also refer to intangible property in many contexts. In *State ex rel. Elvis Presley Intern. Memorial Foundation v. Crowell*, 733 S.W.2d 89, 97-98 (Tenn. Ct. App. 1987), the court recognized for the first time in Tennessee that a celebrity's right of publicity was intangible property. In *B & L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 195 (Tenn. Ct. App. 2004), the court recognized business good will as intangible property. In *Omnicon, Inc. v. King*, 688 S.W.2d 818, 819-20 (Tenn. 1985), a partner's interest in a partnership was treated as an intangible property interest. In *Dowling v. U.S.*; 473 U.S. 207, 230, the court recognized that "[t]he copyright owner . . . holds no ordinary chattel," to the contrary, the interest of the owner of a copyright was recognized as intangible property. In *Amini v. CTI, Inc.*, 185 S.W.3d 415, 420 (Tenn. Ct. App. 2005), stock options were recognized as intangible property rights. In *Servpro Industries, Inc. v. Pizzillo,* 2001 WL 120731, 5 (Tenn. Ct. App. 2001), the purchase of "a franchise" was recognized as the purchase of intangible property in contrast to contemporaneous purchase of "equipment" to be used in the franchised business, which was recognized to be tangible property.

[9]The term "sweat equity"is defined as "financial equity created in property by the owner's labor in improving the property." Black's Law Dictionary (9th ed. 2009). The example provided reads: "The lender required the homeowner to put 300 hours of sweat equity into the property." *Id*.

Based upon the above facts, some of which are admittedly disputed, which Plaintiff insists are material to the claims or defenses upon which summary judgment was erroneously predicated, there exist genuine issues for trial for her claims. *See Byrd*, 847 S.W.2d 208, 215.

Although Defendants maintain their insistence that no material facts are disputed and that they are entitled to judgment as a matter of law based on the undisputed facts, should the court conclude that material facts are disputed, Defendants still insist they are entitled to summary judgment because the terms of the alleged oral agreement are not sufficiently explicit and, therefore, Plaintiff can only establish an agreement to agree, which is unenforceable. In making this assertion, Defendants principally rely on *Seramur v. Life Care Centers of America, Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885 (Tenn. Ct. App. April 2, 2009).

The plaintiff in *Seramur* was a former employee who brought suit to enforce an employment contract pursuant to which he was entitled to acquire an equity interest in an unidentified facility owned by his employer. *Id.* at *1. The employer insisted that no enforceable agreement existed by which the plaintiff was entitled to acquire any equity interest in one of their businesses and filed a motion for summary judgment on that basis. The trial court granted the motion finding that "the agreement entered into between plaintiff and defendant to choose a facility by mutual consent was so indefinite and vague as to be unenforceable." *Id.* at *3. The relevant facts of *Seramur* are as follows:

> [T]he undisputed material facts before the Trial Court were that as a part of plaintiffs agreement to work for Life Care, he was to receive a one-fourth ownership interest *in an undetermined* Life Care facility. *The selection of that facility would be determined at a later date by mutual agreement of the parties*, but he would not be required to contribute capital to acquire that ownership interest, and that he was guaranteed $50,000.00 or actual percentage of cash flow, whichever was greater.
> ***
> It is also an undisputed material fact that defendant furnished plaintiff with a blank LLC operating agreement that he understood would be the agreement that governed the offered one-fourth interest in the defendant entity. *It is further undisputed that the operating agreement provided to plaintiff did not identify a specific Life Care entity* which it applied to and that the formal operating agreement was never completed and was not signed by the parties.

*Id*. at *3 (emphasis added). In finding the agreement so indefinite as to be unenforceable, the court reasoned:

Defendant established the foregoing undisputed material facts regarding the various Life Care entities which defendant and plaintiff were to mutually agree to regarding the partnership. There were approximately 230 Life Care facilities that were in operation at the time plaintiff left his employment with Life Care. Seventy-six of those facilities were operated by Life Care itself, and 154 were operated by a partnership, limited liability company or similar business entity affiliated with Life Care. The 154 facilities operated by a partnership, limited liability company or similar entity, ranged in size from 59 beds to 295 beds, and were located in 28 different states. Accordingly, *the facilities available from which plaintiff and defendant could mutually agree on varied in size, age and location, factors which would cause a variance in the profitability between the facilities.* The undisputed facts demonstrate that *the agreement entered into between plaintiff and defendant to choose a facility by mutual consent was so indefinite and vague as to be unenforceable.* [footnote in original]. *The agreement was an agreement to negotiate in the future as to the selection of actual facility* or as this Court said in *Four Eights, LLC v. Salem*, 194 S.W.3d 484 (Tenn. Ct. App. 2005), the parties had made an "agreement to agree" to something in the future, and such agreements are unenforceable.

*Id*. at *3 (emphasis added). The footnote in the above quote reads:

The facilities available from which Mr. Seramur and Life Care could mutually agree on varied in size, age and location, factors which would certainly cause a variance in the profitability between the facilities. Which of these 154 nursing homes with the variations in profitability was Mr. Seramur to become a partial owner of? Who were the other owners/partners/shareholders in the entity, Life Care and/or others? Who would be the manager of the entity and who would determine when distributions were to be made to the owners and how much? All of these questions demonstrate that the agreement entered into by Life Care and Mr. Seramur to choose a facility by mutual consent was so indefinite and vague as to be unenforceable.

*Id*. at *3 n.1.

Plaintiff insists that *Seramur* is distinguishable because she has identified the specific terms of her agreement while the plaintiff in *Seramur* never did. To highlight the factual distinctions, Plaintiff points out that she introduced written and oral evidence of the agreement by which she would acquire a specific membership interest, five percent, in a specific company in Nashville, Tennessee, Kingdom Creations, LLC, in consideration for her contribution of intangible property, her sweat equity, which was the utilization of her

-20-

connections with the franchising entity for Paul Mitchell schools and with the owners of an accredited cosmetology school to facilitate the acquisition of a franchise and an accredited cosmetology school for the LLC, which she did. She also distinguishes her facts from *Seramur* by noting that the plaintiff in that case never identified the specifics terms of the alleged agreement, noting that he never identified the facility he was to acquire an interest in or the specifics of what his interest in that facility would be. Thus, the modest evidence presented by the plaintiff in *Seramur*, as distinguished from that presented by Plaintiff, is that the plaintiff in *Seramur* expected to acquire an interest in an *unidentified* entity that was to be selected by agreement at a later date from a list of 230 businesses varying in size, age and location, factors which the *Seramur* court found to be significant and uncertain. *Id*. Based upon the uncertainties in *Seramur*, the court found that an unenforceable "agreement to agree" existed due to the uncertainty of the entity in which the plaintiff would obtain his interest. *Id*.

Plaintiff, however, insists the uncertainties that exist in *Seramur* do not exist here, and she relies on both the facts and the legal principles espoused in *Gurley v. King* to support this contention. She also relies on *Gurley* to insist that because she performed her obligations under the agreement in reliance on the specific promises of Mr. Jones that she is entitled to additional protection. *See Gurley*, 183 S.W.3d at 42 (stating "where one party has acted in reliance on an indefinite agreement the courts will act to protect that reliance whether through a contractual or non-contractual remedy."). We shall, therefore, examine the facts and relevant legal principles in *Gurley*.

The defendant in *Gurley* was a performing artist, Matt King, who had contracted with Gary Morris of In House, Inc., an artist management company in 1995 for a term that extended until December 1999. *Id* at 32. Pursuant to this agreement, King paid In House 15% of his gross earnings during the term of their contract and 10% of all revenue earned after the expiration of that agreement from the exploitation of any product created by King during the term of the In House agreement. *Id*. In October of 1997, Gurley was hired by In House to assist in the management of King because King and Gary Morris, who was the account manager for In House,[10] were having personality conflicts. *Id*. Pursuant to her agreement with In House, Gurley was to supervise the King account and serve as the "day-to-day manager" of King on behalf of In House. *Id*. Gurley's assistance thereafter notwithstanding, King's relationship with In House, and particularly Gary Morris, continued to deteriorate. *Id*. Due to the fact that the In House contract was to continue until December 1999, King asked Gurley to attempt to facilitate an early termination of King's management agreement with In House, with the oral assurances by King that he would enter into a management agreement with Gurley when the In House agreement was terminated or expired. *Id*. Furthermore, King

_____

[10]Gary Morris was also the owner of In House, Inc.

orally assured Gurley that, following the termination or expiration of the In House agreement, Gurley would be retained as King's exclusive manager for a period of three years, and that she would be paid the same 15% commission for her managerial services as was In House. *Id*. The parties also signed a memorandum of their agreement in form of a letter on March 20, 1999, which provided the agreement would:

> begin either when [the artist's] agreement . . . ends [December 1999] . . . or earlier if [Gurley] is able to persuade [the management company] to relinquish their contract. . . . The details of the agreement will be worked out later but will basically follow the same arrangement currently in place with [the current management company].

*Id*.

After agreeing to the above oral and written understandings, Gurley continued to function as the "day-to-day manager" for King and attempted to effect an early termination of the In House agreement but that was not successful. Accordingly, King remained under contract with In House until December 1, 1999. Gurley's relationship with King, however, came to a conclusion on December 1, 1999, when King, at a pre-arranged meeting, suggested that Gurley and King "part ways." *Id*. A few days later Gurley wrote King a letter regarding the conversation of December 1, stating that she would no longer attempt any negotiations regarding King's music career. *Id.* at 32-33. She also stated in that letter:

> Notwithstanding your current wishes, you acknowledge that we have performed services for the past year for which we have received no compensation. Additionally, you have a signed agreement with us which runs until December 1, 2002. You have agreed that when other arrangements are made in regards to management, recording or publishing, etc., we will meet to assign an appropriate buy-out amount, both for past services and for those which would have been maintained in the future.

*Id*. at 33. King did not respond to the letter, and Gurley filed suit against King for breach of the March 1999 contract, breach of their oral agreement, and recovery in quantum meruit for value of services rendered. *Id*. King moved for summary judgment alleging the contract, at best, constituted "an agreement to agree," and was not enforceable because essential elements were never agreed to, and the alleged arrangements between the parties were too

indefinite and uncertain to be enforceable. *Id*. The trial court agreed, and summarily dismissed Gurley's breach of contract claim.[11] *Id*.

On appeal, we reversed the summary dismissal of Gurley's breach of contract claims reasoning that the record "conclusively establish[ed] the existence of genuine questions of material fact precluding summary judgment . . . including the significance of the details remaining to be formalized in writing after the letter was signed by both parties." *Id.* at 46. As we explained in *Gurley*, to uphold the trial court's ruling that the March 1999 memorandum was too indefinite and uncertain and there was an absence of essential terms to form a management contract, "it must appear as a matter of law that 'the details of the agreement' to be worked out later were 'essential terms' rather than details not essential to the formation of a contract." *Id.* at 42. Applying these principles, we concluded that "the language used by the parties in the March 20, 1999, document [did] not establish, as a matter law, that such 'details' involved 'essential elements' of a contract." *Id*.

We reached the above conclusion in *Gurley* by analyzing relevant authorities within and without Tennessee and by analyzing the March 1999 memorandum, *inter alia*, *in the context of the conduct of the parties* to determine whether the parties acted upon the memorandum in such a way as to suggest that they believed a binding agreement had been reached. *Id*. at 43; *see also APCO Amusement Co. v. Wilkins Family Restaurants of Am., Inc.*, 673 S.W.2d 523, 527 (Tenn. Ct. App. 1984). With respect to the conduct and actions of the parties based upon the memorandum, this court determined that material factual questions remained to be considered by the trier of fact; specifically, facts surrounding Gurley's performance. As we explained, "*[p]art performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed*." *Id.* at 41 (emphasis added) (citations omitted). Under the subheading "Does a Contract Exist?" we noted that the "[d]estruction of contracts because of uncertainty has never been favored by the law, and with the passage of time, such disfavor has only intensified." *Id.* at 34.

With this principle in mind, we additionally engaged in a thorough analysis of relevant authorities from Tennessee and other states and focused on a case we described as "the landmark decision of a New York Federal District Court in *Teachers Insurance and Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y. 1987)." *Gurley*, 183 S.W.3d at 40. After noting that the New York decision delineated two types of preliminary agreements, "the first type being where parties agree to later formalize a contract about which

---

[11]In dismissing Gurley's breach of contract claim *sua sponte* two days before the scheduled jury trial, the trial court simply revisited its previous denial of the artist's motion for summary judgment; accordingly, this court reviewed the action of the trial court under the standards governing a grant of summary judgment. *Id*. at 33.

there has been complete agreement on all of the essential issues. The second type involves a situation where parties have committed themselves to some of the major terms, but other essential elements remain to be negotiated," *id*., we focused on the two distinct types of preliminary agreements as explained in *Teachers Insurance*:

> Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation. Such an agreement is preliminary only in form - only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.), cert denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. . . . Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)."

> The second and different sort of preliminary and binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type - the binding preliminary commitment - does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counter-party negotiate the open terms in good faith toward a final contract

incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract.

*Id.* at 40-41 (*quoting Teachers Ins. and Annuity Ass'n*, 670 F.Supp. at 498.

Later, in *Gurley*, we concluded that we were dealing with the first type of preliminary agreements discussed in *Teachers Insurance* because, in that case, it was alleged "that all material provisions of the Gurley/King Contract had been agreed to and the parties intended to formalize that agreement by a later writing . . . and that [n]o "good faith" negotiation of essential elements of contract [was] involved." *Id.* at 41. After noting that "[p]art performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed," *id.* (quoting Restatement (Second) of Contracts § 34(2) (1979) (citing *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554 (Tex.1972); *see Somont Oil Co., Inc. v. Nutter*, 743 P.2d 1016 (Mont. 1987)), we focused on the effect of partial performance on the existence of an enforceable contract because we realized that, at that point in the proceedings, we should not be concerned "*with whether or not a contract, in fact, exists between the parties, but rather with whether or not reasonable minds could differ on that question.*" *Id*. at 42 (emphasis added). "If reasonable minds could so differ, summary judgment must be reversed and the case remanded for trial on its merits under principles laid down in *APCO Amusement.*" *Id*. And in determining whether or not the March 1999 memorandum should be construed as a binding contract, we noted that we must keep in mind that

> [t]he primary test as to the actual character of a contract is the intention of the parties, to be gathered from the whole scope and effect of the language used, and mere verbal formulas, if inconsistent with the real intention, are to be disregarded. It does not matter by what name the parties chose to designate it. *But the existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined in case of doubt not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances.*

*Id.* at 43 (quoting 17 Am. Jur. 2d Contracts § 1 (1964)) (emphasis added).

This same approach, examining the conduct of the parties, was adopted by this court in the case of *Bailey v. Brister*, 353 S.W.2d 564 (Tenn. Ct. App. 1961). *See Gurley*, 183

S.W.3d at 43; *APCO Amusement*, 673 S.W.2d at 527. As noted in *Bailey*, in determining whether certain correspondence or, as in this case, communications, between the parties constituted a contract or was merely a part of the negotiations leading to a potential contract, "[t]he practical interpretation of a contract by the parties thereto is entitled to great, if not controlling influence, and will be adopted by the courts." *Id.* (quoting *Bailey*, 353 S.W.2d at 568). "The court explained this rule of interpretation, quoting from Williston on Contracts, § 623, as follows: 'The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only acts but the declarations of the parties may be considered.'" *Id.* (quoting *Bailey*, 353 S.W.2d at 568).

After examining the conduct of the parties in *Gurley*, including the manner the parties acted upon the agreement, we reached the conclusion that a genuine issue of material fact exists due to the fact it was not disputed that Gurley performed services for King while the In House agreement remained in effect; however, as we noted, at issue was whether or not Gurley's performance was as an employee of In House or as the manager-in-waiting in reliance on King's assurances and the March 1999 memorandum. *Id.* In that respect, we found it was a factual determination for the trier of fact, as the evidence was conflicting, particularly as it related to the testimony of Gurley and King although the written memorandum supported the testimony of Gurley.

In the present case, Plaintiff insists she performed her obligations under the agreement. In the context of this issue, we note that Plaintiff established the following undisputed facts regarding her performance of the services which she identifies was to be her consideration, her sweat equity:

2) [Plaintiff] had a personal relationship with Winn Claybaugh one of the original founders of the Paul Mitchell schools. [Plaintiff] Dep. p. 28 ¶¶ 3-8.

> RESPONSE: Undisputed only for purposes of summary judgment, but immaterial to the resolution of Defendants' motion for summary judgment.

\*\*\*

5) [Plaintiff] introduced Dale Jones to Winn Claybaugh as her partner. [Plaintiff] Dep. p. 46 ¶¶ 20-24.

> **RESPONSE**: Undisputed only for the purposes of summary judgment, but immaterial to the resolution of Defendants' motion for summary judgment.

6) [Plaintiff] also introduced Dale Jones to other people that were instrumental in procuring the franchise. [Plaintiff] Dep. p. 73 ¶¶ 6-22.

> **RESPONSE**: Undisputed only for the purposes of summary judgment, but immaterial to the resolution of Defendants' motion for summary judgment.

\*\*\*

17) Dale Jones wanted [Plaintiff] to get the Naves to sell their accredited school to her so that Kingdom Creations could immediately begin receiving federal financial aide once the school opened. [Plaintiff] Dep. p. 71 ¶¶ 17-24.

> **RESPONSE**: Undisputed only for the purposes of summary judgment, but immaterial to the resolution of Defendants' motion for summary judgment.

\*\*\*

40) Dale Jones stated that it was his intent to make [Plaintiff] an owner. Dale Jones Dep. p. 38 ¶¶ 19-21.

> **RESPONSE**: Undisputed to the extend that Dale Jones intended for Valerie Bridgeforth to be an owner in consideration for her proposed investment.

\*\*\*

52) Dale Jones told the Naves that he and Valerie Bridgeforth were going into a partnership to buy a Paul Mitchell School. Dale Jones Dep. p. 72 ¶¶ 19-23.

> **RESPONSE**: Undisputed to the extent that Dale Jones stated he and [Plaintiff] planned to go into a partnership.

Although it is undisputed that Plaintiff exerted substantial time and used her contacts, while working in concert with Mr. Jones to facilitate the LLC's acquisition of a Paul Mitchell school franchise and JNU, Defendants dispute the significance of Plaintiff's involvement in acquiring the Paul Mitchell school franchise or JNU, and whether such efforts constitute the $30,000 *consideration* required of Plaintiff to acquire her five percent interest in the LLC.

Based upon the foregoing principles, the facts, those undisputed and those disputed, the conduct of the parties, the manner in which the parties acted upon the oral representations, and the Organization by Written Consent, reasonable minds could conclude that a binding agreement had been reached. *See Gurley*, 183 S.W.3d at 43; *see also APCO Amusement*, 673 S.W.2d at 527. We have reached this conclusion for *it is undisputed that Plaintiff performed services for Defendants* prior to May 2006 when the LLC's school opened; it is, however, *at issue whether she was or was not afforded the opportunity to acquire her membership interest in the LLC in consideration for those services*. More specifically, it is disputed whether such efforts constitute the $30,000 *consideration* required of Plaintiff to acquire her five percent interest in the LLC. Further, while it is undisputed that there was an agreement by which Plaintiff could acquire a five percent membership interest in the LLC in consideration for a capital contribution of $30,000, Defendants deny the existence of an enforceable agreement by which Plaintiff could acquire the five percent membership interest by means of *intangible* contributions. In the context of this issue, the evidence is conflicting, particularly as it relates to the testimony of Plaintiff and Mr. Jones, as well as the Organization by Written Consent which reasonable minds could conclude supports, at least in part, the testimony of Plaintiff.

For Defendants to establish at the summary judgment stage that Plaintiff cannot prove an essential element of the breach of contract claim *at trial*, Defendants had the burden to identify evidence that tends to disprove an essential element of that claim, which requires more than mere assertions that raises doubts about Plaintiff's ability to prove the claim at trial. *Martin*, 271 S.W.3d at 83-84. The primary evidence relied upon by Plaintiff and Mr. Jones in support of their respective contentions on this issue is deposition testimony from Plaintiff and Mr. Jones by which each contradicts the testimony of the other, yet summary judgment is not the appropriate time to weigh the evidence or to make credibility findings.[12] Moreover, disputed material facts that involve the credibility of witnesses are not to be resolved upon summary judgment; to the contrary, courts must consider the evidence in the light most favorable to the nonmoving party, in this case Plaintiff, and resolve all inferences in that party's favor. *Martin*, 271 S.W.3d at 84; *Stovall*, 113 S.W.3d at 721; *Godfrey*, 90 S.W.3d at 695.

Considering all of the above, including the contradictory evidence relied upon by the parties, especially as it relates to the deposition testimony of Plaintiff and Mr. Jones, the resolution of which may require credibility findings that are not appropriate at the summary judgment stage, the documentary evidence including the unsigned draft of the Organization

---

[12]"To determine whether a dispute as to a fact is genuine, the Court determines whether a reasonable juror could find for the Plaintiff on that fact given the entire record, but *without making any credibility determinations*." *McGee v. Best*, 106 S.W.3d 48, 58 (Tenn. Ct. App. 2002) (emphasis added).

by Written Consent of Kingdom Creations, LLC, and particularly section 2.3, and Plaintiff's testimony that she fully performed her part of the alleged contract, we have determined that a genuine dispute exists concerning facts that are material to the breach of contract claim upon which the summary judgment is predicated that creates a genuine issue for trial. Accordingly, the trier of fact, not the trier of law, must determine these material questions of fact, including the specifics and significance of the oral representations by Mr. Jones to Plaintiff, whether and to the extent her performance was in reliance thereon, and the parties' intentions as it pertains to the relevant provisions Organization by Written Consent of Kingdom Creations, LLC, and particularly section 2.3.

Therefore, we respectfully reverse the summary dismissal of Plaintiff's breach of contract claim and remand the issue to the trial court for further proceedings consistent with this opinion.

We will now address Plaintiff's alternate theories of recovery for the alleged breach, unjust enrichment and promissory estoppel.

## II. UNJUST ENRICHMENT

The theory of unjust enrichment is "founded on the principle that a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so."[13] *Paschall's v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). Courts may impose a contractual obligation under an unjust enrichment theory *if there is no contract between the parties or the contract has become unenforceable or invalid and the defendant will be unjustly enriched unless the court imposes an obligation.*[14] *Id.* (emphasis added). Each case of unjust enrichment must be examined in light of its factual situation and decided according to the essential elements of unjust enrichment. *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995) (citing *id.*).

---

[13]"Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966).

[14]We have previously recognized two types of implied contracts. *Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 524-25 (Tenn. 2005) (citing *Paschall's, Inc.*, 407 S.W.2d at153-54). Contracts implied in fact arise under circumstances establishing the parties' mutual intention to contract. *Id.* at 524 (citing *Paschall's, Inc.*, 407 S.W.2d at 154. Contracts implied in law or quasi contracts are created by law without the parties' assent and are based upon reason and justice. *Id.* (citing *Paschall's Inc.*, 407 S.W.2d at 154). Courts may impose a contract implied in law where no contract exists under various quasi contractual theories, including unjust enrichment. *Id.* at 524-25 (citing *Paschall's Inc.*, 407 S.W.2d at 154).

The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc.*, 407 S.W.2d at 155). The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. *Id.* (citing *Paschall's, Inc.*, 407 S.W.2d at 155); *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). The plaintiff must further demonstrate that he or she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract. *Id.* (citing *Paschall's, Inc.*, 407 S.W.2d at 155; *Whitehaven Cmty. Baptist Church*, 973 S.W.2d at 596).

What constitutes a *benefit* was also discussed in *Freeman Industries*:

A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss. *Lawrence Warehouse Co. v. Twohig*, 224 F.2d 493, 498 (8th Cir. 1955). The underlying principle of the doctrine of unjust enrichment is that a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit. *Paschall's, Inc.*, 407 S.W.2d at 154. In accordance with this underlying principle, we conclude that to recover for unjust enrichment, a plaintiff need not establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives any benefit from the plaintiff if the defendant's retention of the benefit would be unjust. Our conclusion is consistent with other jurisdictions that have also concluded that the benefit received by a defendant need not be direct to establish an unjust enrichment claim. *See, e.g.*, *Hirsch v. Bank of Am.*, 107 Cal.App.4th 708, 132 Cal.Rptr.2d 220, 229 (2003) (holding that to confer a benefit, the plaintiff need not pay the money directly to the defendant); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989) (permitting recovery of a benefit transferred to the defendant by a third party where the third party mistakenly gave the benefit to the defendant instead of the plaintiff, where the defendant procured the benefit from the third party through wrongful conduct,

or where the plaintiff's claim to the benefit is superior to the defendant's claim); *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 155 (Iowa 2001) (concluding that "benefits can be direct or indirect, and can involve benefits conferred by third parties").

*Freeman Indus.*, 172 S.W.3d at 525.

Plaintiff's unjust enrichment claim is succinctly summarized in the second amended complaint, it reads as follows: "[H]ad it not been for [Plaintiff's] services, [Defendants] *would not have been able to obtain [JNU] at the price he obtained it* for, the school *would not have been accredited when it did*, and the *Paul Mitchell certification and franchise would not have been acquired as quickly as it did*," and that "[i]t would be inequitable for [Defendants] to retain this benefit without paying [Plaintiff] for the value thereof."

Defendants moved to summarily dismiss this claim contending that Plaintiff did not provide any valuable goods and services to Defendants for which she was not otherwise compensated, and because Plaintiff was unable to identify any evidence that satisfies the required elements of her unjust enrichment claim. More specifically, Defendants asserted that this claim should be dismissed on the following basis: (1) Plaintiff was "paid as a teacher" at the school; (2) when Plaintiff "could not raise the funds to be an investor, [Plaintiff] submitted her expenses that the various folks incurred in going about investigating this opportunity and those expenses were paid"; and (3) Defendants did not receive a benefit from Plaintiff's relationship with the Naves because JNU was on the market for sale, and "[the Naves] would have sold it, as [Mrs. Nave] testified, to anybody who had $35,000 to come to the table to pay for [it]."

In summarily dismissing Plaintiff's claim of unjust enrichment, the trial court did not make any factual findings; it merely stated that no material facts were disputed, and it adopted and incorporated Defendants' arguments at the summary judgment hearing.[15]

In contending that Plaintiff's unjust enrichment claim fails because she was compensated as an employee, Defendants rely upon *Underwood v. MacMillan/McGraw Hill School Pub. Co.*, No. 03A01-9510-CH-00357, 1996 WL 31139, at *2 (Tenn. Ct. App. Jan. 29, 1996) (stating that "'any enrichment of the defendant must be unjust,' and payment of the salary in exchange for services obviates this element."). To establish that Plaintiff was

---

[15] As noted earlier, Defendants also insist that no enforceable contract exists; we mention this because to recover under a theory of unjust enrichment there must be no existing enforceable contract between the parties covering the same subject matter. *Paschall's, Inc.*, 407 S.W.2d at 154. Thus, the trial court's ruling did not hinge on whether a contract existed.

fully compensated for her services, Defendants relied upon portions of the depositions of Plaintiff and Mr. Jones. The testimony of Mr. Jones that Defendants rely on is as follows:

> Q. So was she considered an employee when she was working there between May 2006 and July 2006?
>
> [Mr. Jones] Again, I'm not certain the exact date as to when she started drawing a salary. I remember the conversation, however. She came to me and said, Dale, *if I'm going to work here and not work at my salon, I need to get compensated for that.* I said, Okay. So tell me how much you think you're going to lose by not working at the salon. And she gave me that information, and then we made sure that we paid her that amount.
>
> Q. Was that an arrangement as an employee or just because you wanted to cover loss?
>
> [Mr. Jones] I wanted to cover whatever loss we had at that time.

(Emphasis added). Defendants also cite to portions of Plaintiff's deposition testimony which affirm that the conversation regarding compensation occurred between Plaintiff and Mr. Jones, and also establishes that the parties agreed that she received $15 an hour for working for the school after it opened in May 2006; however, it is undisputed that the services rendered by Plaintiff to facilitate the acquisition of the Paul Mitchell school franchise and JNU, the accredited school, occurred months prior to May 2006. Accordingly, although it is undisputed that Plaintiff and Mr. Jones agreed she would receive $15 an hour for her employment as an instructor at the school once it opened in May 2006, this undisputed fact *does not establish* that the $15 an hour salary was to compensate Plaintiff for the undisputed services she previously provided for the benefit of Defendants to facilitate the acquisition of the Paul Mitchell school franchise and acquiring an accredited school, by which Defendants were allegedly unjustly enriched.

In addition to the salary at issue above, Defendants contend Plaintiff was "reimbursed" for all of her expenses associated with obtaining the franchise; thus, Defendants were not unjustly enriched. In this regard, Defendants represented the following to the trial court at the summary judgment hearing:

> When [Plaintiff] could not raise the funds to be an investor, she submitted her expenses that the various folks incurred in going about investigating this opportunity and those expenses were paid. *That's not in dispute.*

However, the record reveals this fact is disputed. The only portion of Mr. Jones' testimony that Defendants relied upon to state that Plaintiff was reimbursed was the previously quoted testimony regarding Plaintiff's employment *as an instructor*, and Plaintiff created a dispute

of this fact by denying the assertions that she had been fully reimbursed with her submission of the following portion of her deposition in opposition to the motion for summary judgment:

> Q. Okay. So you did some training, you did some travel. And those expenses were paid by [Defendants]?
> [Plaintiff] Not all of them.
> Q. And you said that there was some travel that's not been reimbursed?
> A. Right.

Moreover, in their response to Plaintiff's statement of undisputed fact, Defendants admitted that Plaintiff was not reimbursed for her efforts to get the school opened as evidence by the following admission:

> 19) [Plaintiff] did not get reimbursed for all of the travel she did to get the school opened. [Plaintiff] Dep. p. 88 ¶¶ 14-16.
>
> > RESPONSE: Undisputed only for purposes of summary judgment, but immaterial to the resolution of Defendants' motion for summary judgment.

The foregoing establishes a dispute of fact as to whether or not Plaintiff was compensated or reimbursed for her efforts to get the school opened, to facilitate the acquisition of the Paul Mitchell school franchise and the accredited school, as distinguished from her compensation for serving as a school instructor after the school opened. Accordingly, we have concluded that factual disputes exist that appear to be material to Plaintiff's claim of unjust enrichment.

With respect to benefits Defendants may have received as a consequence of Plaintiff's contributions and involvement in facilitation the acquisition of JNU, Defendants contend that Plaintiff's claim for unjust enrichment should fail because Defendants did not receive a benefit from Plaintiff's relationship with the Naves because JNU was on the market for sale, and they did not receive a "special price" in the purchase of JNU. We, however, have concluded that this fact, as well as other material facts, are disputed for the following reasons.

Although it is undisputed that the agreement pursuant to which the LLC acquired JNU did not contain a condition that Plaintiff be an owner of the school, and it is undisputed that the Naves had negotiated the price of $35,000 for JNU with a previous buyer, these facts, however, are not determinative of whether Defendants received a benefit from Plaintiff's services in facilitating the acquisition.

-33-

The deposition testimony of Mrs. Nave reveals an attempt to explain, but not without interruption by defense counsel, that the special price for JNU was offered to a previous prospective buyer as a package price, in essence, for the purchase of another asset owned by the Naves.[16] Nevertheless, Defendants insist it is undisputed that the Naves would have sold the accredited school to them for $35,000 regardless of Plaintiff's involvement; however, this fact is directly disputed by the affidavits of Mr. and Mrs. Nave, which were submitted in response to Defendants' motion for summary judgment to create a dispute of fact as to the benefit appreciated by Defendants. Mrs. Nave states succinctly:

> 6. When I met Mr. Jones, he represented to me that he and [Plaintiff] were partners in a venture to purchase the Jon Nave School in order to acquire a Paul Mitchell franchise.

> \*\*\*

---

[16]The following is from Mrs. Nave's deposition:

Q. And so back to this letter of intent . . . it says here that John and Juanda Nave agreed to enter into an agreement to sell Jon Nave University of cosmetology to Joyce Meadows and Michael Martin. Do you agree with that?
[Mrs. Nave]. Yes.
Q. And it says these two schools [referring to JNU and NCA, a second cosmetology school owned by the Naves] are to be sold for $35,000 each. Would you agree with that?
[Mrs. Nave]. That is correct.
Q. And this agreement serves as a letter of intent for both parties. Correct?
[Mrs. Nave]. *Yes. Could I make a statement?*
Q. *After I ask you a question. You can respond to questions that I ask you.* You said earlier that you did not know Ms. Meadows or Mr. Martin --
[Mrs. Nave] No.
Q. -- before this transaction took place?
[Mrs. Nave]. No.
Q. But it appears you offered them the same special price as [Plaintiff] is that correct?
[Mrs. Nave]. *Yes. But I want to put this in the minutes.*
Q. But that's a yes, you did offer them that price?
[Mrs. Nave]. *Yes. But that --*
Q. And that was for each school?
[Mrs. Nave]. *The reason being, first they were going to buy NCA, and then she wanted JNU included. And I told her if they would buy both schools, we would sell it for -- both of them for that price, if they bought both.*
Q. Okay. And so that was a condition --
[Mrs. Nave]. of selling.

(Emphasis added).

-34-

9. *I agreed to sell the school to [Plaintiff] only for $35,000 on the basis of our relationship alone.*

10. *In no way would I have sold the school to Dale Jones for $35,000 unless [Plaintiff] was involved in being an owner in the Paul Mitchell Franchise.*

11. I did not learn that Dale Jones did not allow [Plaintiff] to be part of the Paul Mitchell School until the grand opening of the Paul Mitchell School.

12. *Mr. Jones knew that he would not have been able to purchase the school for $35,000.00 if it was not for [Plaintiff].*

(Emphasis added). Moreover, Mr. Nave echoes the testimony of his wife by stating:

12. *Mr. Jones knew that he would not have been able to purchase the school for $35,000.00 if it was not for [Plaintiff] because a fully accredited cosmetology school is worth well over $200,000.00, a fact that Dale Jones verbalized to me before he purchased the school.*

(Emphasis added).

Based upon the authorities cited earlier, for Plaintiff to escape summary judgment on the issue of unjust enrichment, Plaintiff has the burden of showing genuine issues of material fact as to whether (1) Plaintiff conferred a benefit on Defendants; (2) Defendants appreciated the benefit; and (3) whether it would be inequitable for Defendants to retain the benefit without paying for it. *Freeman Indus.*, 172 S.W.3d at 525; *Paschall's, Inc.*, 407 S.W.2d at 155. The foregoing evidence established that a genuine dispute exists concerning the value of services provided by Plaintiff in facilitating the acquisition of an accredited school, JNU; specifically, whether, as a consequence of her rendering those services, a benefit was conferred on Defendants that Defendants have, or should have appreciated, and whether, under the circumstances of this case, it would be inequitable for Defendants to retain the benefit without payment of the value thereof.

The foregoing notwithstanding, Defendants contend that Plaintiff is merely claiming a finder's fee and there is no basis for such a fee in Tennessee. Defendants rely upon *Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382, 391 (Tenn. Ct. App. 1981), in their assertion that even though Plaintiff claims she is entitled to her sweat equity arising from her efforts - the introduction of the Naves to Defendants - Defendants brief states, "there is no basis under Tennessee law for 'finder's fee' or 'introduction fee' recovery under theory of quantum meruit where a broker did not negotiate or consummate a sale, and where

-35-

parties did not have any contract for commission based on finder's fee." Defendants also rely upon *Bloomgarden v. Coyer*, 479 F.2d 201, 210-12 (D.C. Cir. 1973), in which the plaintiff was not entitled to the award of a quantum meruit "finder's fee" as compensation for services benefitting defendant where such services were rendered not with expectation of compensation but in an effort to promote business with the defendant. We, however, find these authorities distinguishable on their facts.[17] Further, there are many questions which cannot be answered by the summary judgment record, including the economic value of any recovery which might be obtained by Plaintiff, but such questions have little relevance to summary judgment. *See Gurley*, 183 S.W.3d at 47. Therefore, we find the finder's fee argument unpersuasive.

Considering all of the above, including the contradictory evidence relied upon by the parties as it relates to the testimony of Plaintiff, Mr. Jones, and Mrs. Nave, the resolution of which may require credibility findings that are not appropriate at the summary judgment stage, we have determined that a genuine dispute exists concerning facts that are material to the unjust enrichment claim upon which the summary judgment is predicated that creates a genuine issue for trial. Accordingly, on remand the trier of fact should first determine whether a valid contract exists between the parties, and, if not, the trier of fact should consider the merits of Plaintiff's claim of unjust enrichment.

Therefore, we respectfully reverse the summary dismissal of Plaintiff's unjust enrichment claim, and remand the issue to the trial court for further proceedings consistent with this opinion.

---

[17]In *Bloomgarden*, the plaintiff introduced two businessmen (the defendants in the action) to each other on the chance that a coalition to develop the Georgetown waterfront would eventually produce business for the plaintiff's company, and the defendants reasonably understood the plaintiff's activities were directed solely to that end. The plaintiff's "quest for a finder's fee proceeded on the theory that he was entitled to remuneration by virtue of a contract which should either be factually implied from prevalent custom and usage or recognized as a legal consequence of the transaction when viewed in light of the surrounding circumstances." *Id*. In the present case, Plaintiff specifically alleges that the introduction of Mr. Jones to the Naves was based on the agreement that her services would be recognized as the "consideration" for her acquiring a five percent membership interest in the LLC. Moreover, this situation differs from that in *Pacesetter*, where the broker introduced buyer to seller, began negotiations which were discontinued without an agreement, and, then, after a substantial lapse of time, buyer's renewed interest produced fresh negotiations directly between buyer and seller from which, this court held, broker could claim no commission. *Pacesetter*, 635 S.W.2d at 390. Here, Plaintiff introduced Mr. Jones to the Naves in February 2006, subsequent to which negotiations led to the LLC's purchase of JNU three months later. Further, the affidavit of Mrs. Nave states that Plaintiff's involvement was directly related to the price and sale of the school.

III. PROMISSORY ESTOPPEL

Plaintiff alleges that, but for Mr. Jones' promise which prompted her to do the work necessary for the acquisition of the Paul Mitchell school franchise and the purchase of JNU, she would have diverted her attention to obtaining her own school and working her own existing business. Plaintiff alleges she reasonably relied upon this promise to her detriment.

Defendants sought to summarily dismiss Plaintiff's claim of promissory estoppel on the ground that Plaintiff failed to show actual detriment. In response to Defendants' assertion, Plaintiff asserted the economic detriment she suffered is "obvious" because she is not the owner of a company that received $3 million in profits over two years. At the hearing, Defendants asserted that Plaintiff "needs to show an actual detriment from taking the action or some sort of forbearance, not just the harm from not getting what was allegedly promised," and, thus, Plaintiff failed to satisfy a prima facie element of a promissory estoppel claim. We agree.

Promissory estoppel is based on "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999) (citing *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)). There are, however, limits to the application of promissory estoppel, and the reason for the limitation is to avoid an unjust result. *Id*. at 879.

> The limits of promissory estoppel are: (1) *the detriment suffered in reliance must be substantial in an economic sense*; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonable in justifiable reliance on the promise as made.

*Id.* (quoting *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn.1982) (citing L. SIMPSON, LAW OF CONTRACTS § 61 (2d ed. 1965)) (emphasis added).

Plaintiff, however, failed to show *a substantial economic detriment* in relying upon Defendants' alleged promise in her response to the motion for summary judgment. More specifically, Plaintiff failed to identify evidence that supported her conclusory assertion that she suffered *substantial* detriment. Instead, Plaintiff merely responded with conclusory statements that the "economic detriment is obvious," because "[Plaintiff] is not an owner in a school that generated over $3 million in gross revenue the first two years that it was in existence due to her efforts," and that "this speaks for itself." Moreover, in her appellate

brief, Plaintiff relies upon the same conclusory statements, yet she fails to cite any rule or case law to support her contention.

Although Plaintiff identified evidence to create a dispute of fact concerning her reliance on the alleged promise that she would obtain a membership interest in the LLC in consideration of her sweat equity, she failed to identify evidence sufficient to create a genuine dispute of fact concerning whether she suffered substantial detriment because she testified that her salon remained open and she continued to see clients at her salon during the relevant period. As for her mere assertions that her loss, her detriment, was "obvious" and it "speaks for itself," they are insufficient to create a genuine dispute of fact on this issue.

We, therefore, affirm the summary dismissal of Plaintiff's claim of promissory estoppel.

IV. BREACH OF FIDUCIARY DUTY AND FAIR DEALING

Plaintiff contends the trial court erred in the summary dismissal of her generic claims for breach of fiduciary duty and fair dealing against Defendants, both the LLC and Mr. Jones. Plaintiff additionally asserts a claim pursuant to Tenn. Code Ann. § 48-240-101, contending that she was expelled as a member of the LLC for which she has a cause of action.

In order to prevail on her generic claims of fiduciary duty and fair dealing, Plaintiff must show: (1) a special duty exists by one person to another based on the nature of their relationship; (2) a breach of that special duty by the fiduciary; (3) the breach was the proximate cause of damages to the plaintiff; (4) damages arising from the breach of the fiduciary duty. *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011). We have determined that Plaintiff has failed to present facts sufficient to establish such a duty by either Defendant; thus, the generic claims were properly dismissed.

As for any statutory fiduciary duty a member of a member-managed LLC may owe to other members, this court previously interpreted the Tennessee Limited Liability Company Act, and specifically Tenn. Code Ann. § 48-240-102(a), as stating that members did not owe a fiduciary duty to other members. *See McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002) (stating the statute that was in effect "define[d] the fiduciary duty of members of a member-managed LLC as one owing to the LLC, not to individual members."). In 2006, the General Assembly enacted the Tennessee Revised Limited Liability Company Act (the "New Act"), codified at Tenn. Code Ann. §§ 48-249-101 to -249-1133, pursuant to which members of a member-managed LLC do owe fiduciary duties to each other, specifically the duties of loyalty and care. *See* Tenn. Code Ann. § 48-249-403(a)-(c). Thus, a member-to-member duty may exist, subject to the applicability of the New Act to LLC's formed prior to or after

-38-

January 1, 2006.[18] Nevertheless, we have determined that neither statutory scheme applies because, although Plaintiff vehemently contends she is entitled to be a member of the LLC, it is undisputed that Plaintiff has never been conveyed a membership interest in the LLC and, therefore, she has never been a member of the LLC.[19] Accordingly, Mr. Jones did not owe such duty to Plaintiff.

As for her wrongful expulsion claim under Tenn. Code Ann. § 48-240-101, it is undisputed that Plaintiff never owned a membership interest in the LLC and one cannot be wrongfully expelled if one is not a member. Therefore, Plaintiff cannot prove at trial that she was wrongfully expelled as a member from the LLC pursuant to Tenn. Code Ann. § 48-240-101.

We, therefore, affirm the summary dismissal of Plaintiff's breach of fiduciary duty and fair dealings claim.

---

[18]The Tennessee Revised Limited Liability Company Act (the "New Act"), codified at Tenn. Code Ann. §§ 48-249-101 to -249-1133, made extensive revisions to the operation of LLCs in Tennessee and became effective on January 1, 2006. *See* Tenn. Code Ann. § 48-249-1002. The New Act applies to all LLCs formed after January 1, 2006. *Id.* LLCs formed *prior to* January 1, 2006, continue to be governed by the Tennessee Limited Liability Company Act (the "Prior Act"), codified at Tenn. Code Ann. §§ 48-201-101 to 248-606, unless they expressly choose to be governed by the New Act. *See* Tenn. Code Ann. § 48-249-1002(b). As a result, both the New Act and Prior Act govern LLCs in Tennessee depending on the particular LLC at issue.

Kingdom Creations, LLC was formed on December 8, 2005 under the Prior Act; accordingly, Tenn. Code Ann. § 48-240-102(a) governs the fiduciary duty of members of a member-managed LLC, which reads as follows:

> Except as provided in the articles or operating agreement, every member of a member-managed LLC must account to the LLC for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the formation, conduct, or liquidation of the LLC or from any use by the member of its property including, but not limited to, confidential or proprietary information of the LLC or other matters entrusted to the member as a result of such person's status as a member.

Tenn. Code Ann. § 48-240-102(a).

[19]For an in depth discussion of the fiduciary duties owed, or not owed, by members of an LLC to other members, *see Rock Ivy Holding, LLC v. RC Properties, LLC*, No. M2012-02702-COA-R3-CV, __ S.W.3d __, 2014 WL 356982, at *12-15 (Tenn. Ct. App. Jan. 30, 2014).

## IN CONCLUSION

The judgment of the trial court is affirmed in part, and reversed in part, and this matter is remanded with costs of appeal assessed against Defendants.

_____
FRANK G. CLEMENT, JR., JUDGE